1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8

9    MICHAEL JOSEPH MULDER,              )
                                          )
10              Petitioner,               )          3:09-CV-00610-PMP-WGC
                                          )
11   vs.                                  )
                                          )          **ORDER**
12   RENEE BAKER,[1] *et al.*,            )
                                          )
13              Respondents.              )
                                          )
14   _____/

15          In this action brought under 28 U.S.C. § 2254, petitioner Michael Mulder, through counsel,

16   has made a motion for a stay pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir.

17   2003), which requires a court to stay capital habeas proceedings upon a showing that the petitioner

18   is incompetent.  Docket ##18/19.  For the reasons set forth below, the motion shall be granted.

19          **I.     PROCEDURAL BACKGROUND**

20          In February 1998, a jury sitting in the Eighth Judicial District Court for Nevada returned

21   verdicts finding Michael Mulder of (1) first degree murder, (2) robbery (victim 65 years of age or

22   older) and (3) burglary while in possession of a firearm.  After a penalty phase hearing, Mr. Mulder

23   was sentenced to death for the murder.  The jury found the following aggravating circumstances for

24   the murder:  (1) the murder was committed while Mulder was engaged in the commission of or an

25   _____

26          [1]      Renee Baker is substituted for her predecessor, E.K. McDaniel, as Warden of Ely State
     Prison.  Fed. R. Civ. P. 25(d).

1  attempt to commit burglary (2) the murder was committed while Mulder was engaged in the

2  commission of or an attempt to commit robbery and (3) Mulder was previously convicted of two

3  violent felonies.

4      Mulder timely appealed his conviction and sentence to the Nevada Supreme Court.  On

5  January 18, 2000, the Nevada Supreme court affirmed Mulder's conviction in a published opinion,

6  *Mulder v. State*, 116 Nev. 1, 992 P.2d 845 (2000).  Mulder filed a petition for rehearing which was

7  denied.   His petition for writ of certiorari to the United States Supreme Court was also denied.

8  *Mulder v. Nevada*, 531 U.S. 843 (2000).

9      In January 2001, the state district court appointed Christopher R. Oram as post-conviction

10  counsel for Mr. Mulder.  In May 2001, Oram filed a petition for post-conviction relief in the state

11  district court, then, in July 2001, a supplement to the petition.  While that proceeding was pending,

12  Oram also filed a motion to reverse sentence of death because of a

13  stroke Mulder suffered on March 15, 2001, at Ely State Prison (ESP).  The state district court

14  ordered psychological testing and subsequently, in October 2004, denied the motion.

15      In January 2005, Oram filed a motion to stay all habeas proceedings until Mulder was found

16  competent to assist counsel.  The state district court held an evidentiary hearing on March 10 and 15,

17  2005, and found Mulder competent to assist counsel and to proceed with the post-conviction

18  proceedings.  In February 2006, the court entered an order denying Mulder's ineffective assistance

19  of counsel claims, but granting penalty phase relief based on *McConnell v. State*, 120 Nev. 1043,

20  102 P.3d 606 (2004).[2]

21      Both the State and Mulder appealed.  In June 2009, the Nevada Supreme Court entered an

22  order reversing the state district court's decision to grant relief under *McConnell* and affirming the

23  lower court's decision to find Mulder competent and to otherwise deny relief.  Mulder filed a

24  _____

25      [2]  In *McConnell*, the Nevada Supreme Court ruled that it is "impermissible under the United
States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the
26  felony upon which a felony murder is predicated."  *McConnell*, 102 P.3d at 624.  The Nevada Supreme
Court subsequently decided that *McConnell* represents a change in the substantive law, and that it
therefore is to be applied retroactively.  *See Bejarano v. State*, 146 P.3d 265, 274 (Nev. 2006).

1   petition for rehearing that was denied in September 2009.  On October 15, 2009, Mulder's counsel

2   filed a petition for writ of habeas corpus in this court, which initiated this proceeding.  On January

3   20, 2010, counsel, the Federal Public Defender's office (FPD), filed an amended petition.

4   On February 4, 2010, the FPD made its motion for a stay pursuant to *Rohan*.  In response to

5   that motion, the State moved the court for permission to have Mulder examined by their own mental

6   health experts.  In granting that motion, the court allowed respondents 60 days to have their experts

7   complete their examination of Mulder and set a deadline, subsequent to those examinations, for the

8   State to respond to the motion for a stay.

9   On January 11, 2011, this court entered an order concluding that Mulder had made a

10  threshold showing sufficient to warrant a competency determination.  On August 1-4, 2011, this

11  court held an evidentiary hearing to assist in that determination.

12  **II.      EVIDENCE PRESENTED**

13  **A.  Exhibits**

14  The following is an overview of relevant portions of the exhibits admitted into evidence at

15  the evidentiary hearing.

16  1.  *Report of Dr. William Noel*

17  Dr. Noel is a doctor of osteopathic medicine who, according to his report, is board certified

18  in family practice with 35 years of clinical experience, mostly involving primary care and

19  emergency medicine.  (Pet. Ex. 1, P0001.)  He was contacted by the ACLU in 2007 to review health

20  records of prisoners at ESP.  (*Id.*)  After reviewing the records, he traveled to the prison to discuss

21  his findings with the medical director of the Nevada Department of Corrections (NDOC).  During

22  that visit, he was able to speak with several prisoners whose cases he had identified as urgent,

23  including Mulder.  (*Id.*)

24  Noel noted in his report that, based on the medical records he reviewed, it did not appear as

25  if Mulder had received any treatment for his stroke in March 2001 and was not taken to the hospital

26  until two weeks after it occurred.  (*Id.*, P0011.)  He also noted, however, that the NDOC medical

1   director told him that Mulder had actually been taken to the hospital immediately.  (*Id*.)  Noel found

2   that Mulder was extremely impaired on his right side and had difficulty walking and talking.  (*Id*.,

3   P0011-12.)  He concluded that Mulder had been a victim of malpractice due to ESP's failure to

4   provide therapy and a wrist brace to prevent the severe contracture of his right wrist.  (*Id*., P0012.)

5   Noting that Mulder had told him that he had fallen several times trying to get into the shower, Noel

6   also commented on ESP's failure to accommodate Mulder's disability.  (*Id*.)

7         2.  *Psychological Evaluation by Carol Milner, Ph.D.*

8         Dr. Milner was a staff psychologist at ESP who examined Mulder in November 2003.  (Resp.

9   Ex. 501, R12-13.)  She conducted another assessment of Mulder in August 2004 in response to a

10   request for a competency evaluation.  (*Id*., R14-15.)  During the second evaluation, Mulder

11   completed the Wechsler Adult Intelligence Scale - Revised (WAIS-R), netting a full scale IQ score

12   of 69.  (*Id*., R14.)

13         Dr. Milner reported that her second evaluation was consistent with her first in that both

14   showed that Mulder "had difficulty with general knowledge and exhibited responses that would be

15   inconsistent with an individual with similarly reported education," demonstrated expressive aphasia

16   and word finding difficulties, and had difficulty "with judgment and abstraction, and common

17   problem solving ability."  (*Id*., R15.)  She opined that his impairments "may be consistent with both

18   the stroke he suffered from as well as repeated polysubstance abuse initiated in his teen years."  (*Id*.)

19         3.  *Neuropsychological Assessment by Thomas Kinsora, Ph.D.*

20         Dr. Kinsora examined Mulder at Nevada State Prison in May 2003 at the request of Oram,

21   Mulder's state post-conviction counsel.  (Resp. Ex. 502.)  According to Kinsora, his assessment

22   revealed several areas of cognitive impairment including the following:  intellectual functioning in

23   the mentally retarded range (i.e., full scale score of 69);[3] spelling, reading comprehension, and math

24   skills significantly lower than normal; problems with attention, reaction time, and mental tracking;

25   

26        [3]    Kinsora's report warns, however, that the validity of Mulder's IQ score is questionable given his circumstances – i.e., someone whose has lost some, but not all, of his acquired skills (most notably expressive language) due to his stroke.

1   severe deficits understanding and expressing language; significant deficits with abstract reasoning;

2   and significant deficits in verbal memory for both immediate and delayed recall of stories and on

3   measures of recognition.  (*Id.*, R36.)

4         Kinsora opined in his report that Mulder cannot realistically assist counsel and gave several

5   reasons.  He noted the Mulder is *severely* impaired in his ability to understand what is being said by

6   his attorneys and what is being said in court.  He also noted that Mulder is impaired in his ability to

7   do the following: make important decisions by properly weighing various factors, communicate with

8   his attorneys and within the courtroom, retain important details during proceedings and pull them

9   together when needed to assist counsel, and reason on an abstract level as he had prior to his stroke.

10   In addition, he listed Mulder's ability to understand the complexities of his case and to recall

11   important details from time period of the crime as *likely* impaired.  (*Id.*, R37.)

12         4.  *Transcript of March 2005 Evidentiary Hearing in State Court*

13         At this hearing on Mulder's motion to stay proceedings due to his alleged incompetence, the

14   state district court heard testimony from three medical experts – Milner, Kinsora, and Terrell

15   Bishop, a psychiatrist at ESP.  (Resp. Ex. 503.)

16         Dr. Milner testified about her evaluations of Mulder in 2003 and 2004.  She stated that, as to

17   the former, her initial conclusions were that Mulder had some degree of memory with regard to his

18   schooling, his family, and his girlfriend at the time of the murder, but had difficulty with memory

19   and comprehension in relation to more specific information.  (*Id.*, R49-50.)  She also concluded that

20   Mulder displayed both expressive and receptive aphasia.  (*Id.*, R50-51.)  Milner also testified about

21   administering the WAIS-R and Mulder receiving a full-scale IQ score of 69.  (*Id.*, R51.)

22         Dr. Milner further testified that she did not have difficulty conversing with Mulder during

23   either evaluation – i.e., he was able to understand her and communicate to her and she was able to

24   understand him.  (*Id.*, R51-52.)  She also felt that Mulder understood why he was being evaluated

25   / / /

26   / / /

1  and had a basic understanding of the procedural posture of his case.  (*Id.*, R52-53.)  She opined that

2  was Mulder capable of communicating with and assisting post-conviction counsel with his case.

3  (*Id.*, R54.)

4      On cross-examination, Dr. Milner testified that Mulder had told her that he had no memory

5  of his trial.  (*Id.*, R56-57.)  She also testified that Mulder's expressive aphasia and lack of effort may

6  have contributed to a depressed IQ score.  (*Id.*, R64.)

7      Dr. Bishop testified that he evaluated Mulder twice at ESP, once in 2003 and once in 2004.

8  (*Id.*, R70.)  He reported that Mulder's claims as to lack of memory of entire blocks of time were

9  inconsistent with things he said at other points in his interview and with the type and location of the

10  stroke he suffered.  (*Id.*, R72-74.)  Dr. Bishop noted some aphasia, but stated that Mulder was able

11  to comprehend well and respond well if given time to do so.  (*Id.*, R74.)

12      Dr. Kinsora testified that he performed tests to screen for malingering and found that Mulder

13  was making a good effort.  (*Id.*, R126-29.)  He testified about Mulder receiving an IQ score of 69,

14  and pointed out that, while it shows Mulder's ability to "understand his world" is much lower than it

15  was prior to his stroke, there is a "major difference" between someone with a 69 IQ after a brain

16  injury and someone the same age who has always had a 69 IQ.  (*Id.*, R130.)  Kinsora stated that

17  Mulder scored very poorly (0.5 percentile) on the part of the test that assessed working memory.

18  (*Id.*, R131-32.)

19      Dr. Kinsora testified that his interview and testing of Mulder revealed lapses or gaps in long

20  term memory that were consistent with the type and severity of the stroke he suffered.  (*Id.*, R 132-

21  34.)  He also testified that research showed that severe damage to expressive and receptive language

22  causes significant memory disruption because memory is extremely reliant on language processing.

23  (*Id.*, R134.)  He noted that Mulder possesses the skills necessary to understand basic commands and

24  to communicate his basic needs, but that he begins to have difficulty when more complex elements

25  are added. (*Id.*, R139-140.)  He also testified that it is not uncommon for stroke victims to lose

26  substantial portions of their autobiographical memory.  (*Id.*, R145.)

1          5.  *Psychological Evaluation by Jethro W. Toomer, Ph.D.*

2          Dr. Toomer is a forensic psychologist retained by Mulder's current counsel, assistant federal

3   public defender Brian Abbington.  (Resp. Ex. 504, R232.)  According to his curriculum vitae, he is a

4   consulting psychologist, specializing in forensic psychology and working as a professor in the

5   Graduate Training Program in Mental Health Counseling at Florida International University.  (*Id.*,

6   R241.)

7          Dr. Toomer examined Mulder and administered several diagnostic tests in December 2009.

8   According to Toomer's report, Mulder is a "poor historian with respect to his developmental history

9   and apologizes for being unable to provide a logical, coherent and sequential account of events."

10  (*Id.*, R234.)  Even so, it appears from the report that Mulder was able to provide Toomer with

11  general facts regarding his family history and make-up, educational background, his criminal

12  history, and his past substance abuse.  (*Id.*)

13         Toomer noted that communication with Mulder "often requires simplification and

14  clarification" and that "receptive and expressive aphasia" were prominent throughout the

15  evaluation."  (*Id.*, R233.)  He also noted, however, that Mulder "is able to make himself readily

16  understood with certain boundaries" and that "[a]t a very basic level some of his ideas reach their

17  intended goal without loosening of association."  (*Id.*)

18         The report also indicates that Toomer tested Mulder's IQ, obtaining a full scale score of 70.

19  (*Id.*, R235.)  Toomer noted that the results of various sub-tests showed deficits "associated with

20  abstract reasoning ability and the ability to transition from concrete to abstract reasoning," as well as

21  deficits in "concentration, visual memory, eye/hand coordination, visual/motor speed and the ability

22  to learn non-verbal material."  (*Id.*, R236.)  Other tests, according to Toomer, showed organic brain

23  dysfunction (Bender Gestalt Designs), chronic substance abuse (SCID), and a moderate to severe

24  level of impairment in overall personality organization (MCMI-III).  (*Id.*, R234-37.)

25         Toomer summarized his opinion as follows:

26             [B]ackground factors including predispositional family and environmental
              variables, substance abuse, erratic, unpredictable and stressful developmental history

7

1

> combined with the 2001 cardiovascular accident has had a profound [effect] on
> [Mulder's] life and functioning, rendering him unable to assist post-conviction

2

> counsel, given secondary thought processing deficits which appear prominent.

3    (*Id.*, R238.).

4          6. *Psychiatric Assessment by Julie B. Kessel*

5          Dr. Kessel is a psychiatrist retained by AFPD Abbington.  (Pet. Ex. 3,  P0035.)  She is a

6    medical doctor licensed in Pennsylvania, North Carolina, and Florida and is currently employed as

7    the Senior Medical Director for CIGNA, an insurance company.  (*Id.*, P0046; docket #69, p. 21.[4])

8    She maintains a small private practice doing forensic psychiatry.  (*Id.*)  She examined Mulder on

9    November 23, 2009, and prepared a report dated January 4, 2010.  (Pet. Ex. 3, P0035-44).

10         Kessel noted in her report that Mulder spoke with "stuttering and slurred speech, and

11   frequent mispronunciation of sounds and words," did not seem to have control of his speech at

12   times, and "used curse words frequently and out of context at times."  (*Id.*, P0040.)  She also noted

13   that Mulder was friendly and polite and seemed fully cooperative and that he was "happier than his

14   circumstances seemed to warrant."  (*Id.*)

15         Kessel reported that, during her evaluation, Mulder was "difficult to understand, because of

16   the dysarthric motor quality of his speech as well as his difficulty finding and using words to express

17   himself."  (*Id.*, P0041.)  In addition, it was not always clear to her what ideas he was trying to

18   convey or to what question he was responding.  (*Id.*)  She noted Mulder's thought content was

19   poorly organized and, if a sentence contained more than one idea, he could not respond to it.  (*Id.*)

20   She also found, however, that he was able to get basic ideas across and was able to respond to some

21   things more easily than others.  (*Id.*)  Mulder was able focus on issues "charged with emotional

22   content" and seemed fixated on them.  (*Id.*)

23         Kessel's  report contains a fairly detailed account of his life history, which was apparently

24   related to Kessel by Mulder himself .  (*Id.*, P0037-39.)  Even so, Kessel concluded that Mulder's

25

26         [4] Unless otherwise noted, all citations to page numbers for documents located on the court's
docket refer to the CM/ECF pagination, which often differs from the page number on the imaged
document.

memory was difficult to assess due to his language deficits. (*Id.*, P0041.) She further concluded that Mulder had a "at least partial memory for his past, the events leading up to the homicide, and elements of the trial," and was able to "provide an outline of relevant events in his life," but that it was clear to her that he "is unable to offer specific details from much of his life." (*Id.*)

Kessel summarized her findings by stating, in part:

> My examination is consistent with the presence of dementia, expressive, receptive, and anomic aphasia, and a change in personality whereby he is content, easygoing and happy. His memory, language and motor behavior appears [*sic*] to have improved gradually over a number of years, in spite of lack of formal rehabilitative services. His memory is inconsistent, appears stronger when linked to emotional content, and his ability to form and recall new memory is markedly impaired. His ability to communicate his basic needs and interests is preserved at this point. His ability, however, to engage in meaningful dialogue and to discuss matters or importance to his future, or to weigh alternative bits of information to the extent he is competent to assist in his own appeal is inadequate. . . .

(*Id.*, P0043-44.) Like Toomer, Kessel opined in her report that Mulder is not competent to assist counsel in these proceedings. (*Id.*)

### 7. *Psychiatric Evaluation by Melissa Piasecki, M.D.*

Dr. Piasecki is a forensic psychiatrist who evaluated Mulder on June 11, 2010, at the State's request. (Resp. Ex. 510.) According to her curriculum vitae, she is a professor of psychiatry at the University of Nevada School of Medicine and on the faculty of the National Judicial College. (Resp. Ex. 511, R1130.) She completed a fellowship in forensic psychiatry and teaches a legal course on competence to stand trial. (*Id.*,; docket #71, p. 7-8.)

According to Dr. Piasecki's report of the June 2010 evaluation, Mulder reported to her that, other than difficulties with the shower, he is able to maintain his hygiene independently and described for her his daily exercise routine. (Resp. Ex. 510, R1127.) He further reported that he is a sports fan of several sports teams, that he is unable to write well with his left hand, and that he enjoyed reading before his stroke but is no longer able to track the narratives in books. (*Id.*) The report also indicates that Mulder reported that he is not able to keep track of card games or checkers. (*Id.*)

9

1   Mulder related some of his personal history to Dr. Piasecki, including his family background

2   and history of substance abuse.  (*Id.*, R1127-28.)  Piasecki noted in her report that Mulder's speech

3   was "spontaneous and non-fluent" and that he "often stammered and had word finding difficulties."

4   (*Id.*, R1128.)  She also noted that Mulder occasionally lost track of his thoughts in mid-sentence.

5   (*Id.*)  Dr. Piasecki indicated that Mulder reported his mood as "good" and that he appeared "upbeat

6   and cheerful."  (*Id.*)

7   With respect to cognitive screening, Dr. Piasecki reported that Mulder was oriented as to

8   date and location (although he was two days off on the date) and was able to register and repeat her

9   name.  (*Id.*)  In addition, he was able to recall, after a three minute delay, one of three words

10  spontaneously and another with prompting.  (*Id.*)  Mulder accurately repeated a phrase and named

11  common objects, performed serial subtractions with errors after the third number, and was able to

12  read and follow simple commands.  (*Id.*)  Finally, she noted that Mulder demonstrated abstract

13  thinking on a series of comparisons.  (*Id.*)

14  Piasecki reported that Mulder knew that his attorney was working on his case, but was

15  unable to name him (although he did recognize his name on a document and spontaneously recalled

16  it later in the interview).  (*Id.*)  Mulder also knew that his attorney was attempting to prevent him

17  from being executed and expressed motivation to assist him in that regard.  (*Id.*)  Piasecki also noted

18  that Mulder was able to "describe potential strategies that had potential to change his conviction to a

19  lesser offense and remove him from death row."  (*Id.*)  In addition, Mulder expressed to her that he

20  would prefer that his attorney pursue a strategy that could allow for his eventual release, rather than

21  focusing on delaying his execution.  (*Id.*)  Finally, Piasecki stated that Mulder recalled past legal

22  proceedings regarding his competence and expressed concern that a physician once testified that he

23  was faking his impairments.  (*Id.*)

24  Piasecki diagnosed Mulder with cognitive disorder secondary to brain injury, but concluded

25  that he demonstrated competence to proceed with his habeas proceeding despite the stroke he

26  suffered in 2001.  (*Id.*, R1129.)  She specifically found as follows:

1          Although Mr. Mulder's speech is non-fluent and he has word finding
2     difficulties, he was able to sustain narratives and participate in a reciprocal
      conversation with prompting.  I did not observe Mr. Mulder having difficulties
3     understanding my speech and he was responsive to my questions throughout.  He is
      motivated to assist his defense attorney and expressed gratitude to Mr. Abbington for
      his efforts on his behalf.  Mr. Mulder demonstrated logical thinking regarding his
4     legal situation and described strategies his attorneys might use to help him.

5     (*Id.*)

6          8.  *Psychiatric Evaluation by Lindell Bradley, M.D.*

7          Dr. Bradley is a psychiatrist who evaluated Mulder at the State's request on June 14, 2010.

8     (Resp. Ex. 512.)  According to his testimony at the evidentiary hearing, Dr. Bradley works half-time

9     at Lake's Crossing Center, where he does evaluations of legal competence. (Docket #72, p. 4.)  He

10    also testified that he has about 20 years of experience in "civil competency matters."  (*Id.*)

11         In his report, Bradley stated that Mulder was able to accurately state the purpose of the

12    evaluation.  (Resp. Ex. 512, R1146.)  Bradley reported that Mulder described his mood as "good"

13    and told him that his mood had improved since his stroke.  (*Id.*, R1147.)  He also reported that

14    Mulder was "able to relate recent and past personal history," including aspects of his family

15    background, his substance abuse history, his educational background, and his medical history.  (*Id.*,

16    R1147-48, R1150.)

17         Bradley found that Mulder's "thought process was goal-directed and that he was able to

18    answer questions in a goal-directed manner." (*Id.*, R1148.)  He also noted that Mulder had difficulty

19    with word-finding and pronunciation, but that, with some guidance and additional questioning, he

20    was able to "adequately express even fairly complex ideas." (*Id.*)

21         In addition, Bradley noted that Mulder was able to recall that he had seen Dr. Piasecki the

22    previous week and that Mulder volunteered that some the questions she had asked him were

23    identical to those Bradley asked.  (*Id.*)  Mulder also told Bradley that he was found guilty of murder

24    and sentenced to death and, though he maintained his innocence, described for Bradley details of the

25    crime, including the fact that the victim was an "old man" and was bound with tape and that Mulder

26    ///

11

1    was also convicted of stealing a gun and a car from the victim, neither of which were ever found.

2    (*Id.*, R1149.)

3        Bradley reported that Mulder understood that the role his attorney was to assist him with

4    legal appeals and expressed faith in his attorney to work on his behalf.  (*Id.*)  According to Bradley,

5    Mulder told him that his attorney had been denied permission to attend the evaluation and, when

6    asked why his attorney was not allowed to be present, Mulder stated that the judge was probably

7    concerned that his attorney would try to influence the course of the evaluation.  (*Id.*)

8        Bradley stated in his report that he discussed hypothetical scenarios with Mulder and that

9    Mulder told him that he would like to have his death sentence overturned if he could be sentenced to

10   twenty-five years in prison, which would allow him to look forward to eventual release.  (*Id.*)

11   Bradley also noted that Mulder told him that the Phoenix Police Department was not able to identify

12   fingerprints left on the tape used on the victim, but that an FBI expert was brought in and identified

13   the prints as belonging to Mulder.  (*Id.*)  Mulder told Bradley that he wanted to appeal on that

14   ground because the FBI agent was not an expert and was wrong about the fingerprints.  (*Id.*)

15       Bradley reported that Mulder could state the month, year, day of the week, and his current

16   age, as well as the name of the prison where he normally resides, when he had arrived at his current

17   location, and when he would be returning to ESP.  (*Id.*, R1149-50.)  When asked to remember three

18   objects for later recall, Mulder subsequently stated that he could not recall any of them.  (*Id.*,

19   R1150.)  However, with category prompts and encouragement, he named all three objects.  (*Id.*)  On

20   serial subtractions of three from twenty, Mulder made it to fourteen, "then made minor errors which

21   he didn't self-correct."  (*Id.*)  He failed to perform a complex word problem, but was able to follow a

22   three-step command.  (*Id.*)

23       Bradley concluded that Mulder has the capacity to understand and communicate rationally

24   with his attorney.  (*Id.*, R1151.)  He noted Mulder's deficits in comprehension of complex and

25   detailed information and difficulties in expressing complex ideas.  (*Id.*)  Even so, he found as

26   follows:

1

2

3

4
> Mr. Mulder shows good recall of matters pertaining to his criminal case.  His thought process is organized and goal-directed.  He understands the legal process.  He demonstrated good understanding of his criminal case and of the purpose of appeals.  He can discuss his legal case, the process of appeals and can rationally consider hypothetical situations regarding his sentence.  He demonstrates no psychosis or disturbance of mood which would interfere with his ability to work with his attorney in the course of his appeals. . . .

5
(*Id.*)

6
### 9. *Mulder's Prison Records*

7
The prison records for Mulder admitted into evidence at the evidentiary hearing are, for the

8
most part, unremarkable in terms of either proving or disproving Mulder's competence.  A

9
substantial portion of the records consists primarily of standard intake and classification information

10
and various documents related to the criminal proceeding that resulted in Mulder's convictions and

11
death sentence.  (Resp. Ex. 506., R262-343, R418-35.)

12
Also included in the records are numerous inmate book requests and inmate request forms

13
for other items and services.  (*Id.*, R344-414.)  At the evidentiary hearing, Dr. Kessel testified that

14
these requests are notable because they show that, prior to the stroke, Mulder's handwriting is

15
"pretty good and . . . pretty succinct" and that he typically requested "political thriller and thriller

16
type books," while after the stroke, somebody else is doing the writing for him, and Mulder's

17
signing it in "very squiggly unstable handwriting."  (Docket #69, p. 84-85.)  Kessel also noted that, a

18
time or two after the stroke, the type of books requested appear to be the same, but then they are all

19
about pornography and pictures of women.  (*Id.*)  Based on this court's review of the records, Kessel

20
is, for the most part, correct in her assessment of the requests, although there at least a few requests

21
for books in the thriller genre dated a year or more after Mulder's stroke.  (Resp. Ex. 506, R363-65.)

22
The prison records also include notices and dispositions of disciplinary infractions assessed

23
against Mulder.  (*Id.*, R436-49.)  Most of the infractions are fairly innocuous (e.g., losing his prison

24
ID card), with an exception being a pre-stroke incident in which he was accused of arguing with a

25
correctional officer and calling him a "faggot bitch."  (*Id.*)

26
/ / /

13

1    Lastly, the records include approximately 200 pages of records related to Mulder's prison

2    trust account and canteen purchases.  (Resp. Ex. 507, R456-653.)  Dr. Piasecki reported in her report

3    and  testified at the evidentiary hearing that her review of these records showed that Mulder had the

4    ability to track his canteen orders and the funds in his prison account.  (Resp. Ex.510, R1129; docket

5    #71, p. 78.)  Dr. Kessel disagreed with this assessment.  (Docket #69, p. 83-84.)  In her opinion, it

6    appeared as if Mulder was simply in the habit of purchasing the same merchandise (primarily junk

7    food) each month and that someone would routinely deposit an amount into the account that

8    exceeded the amount of Mulder's expenditures.  (*Id.*)

9        10.  *Mulder's Medical Records*

10    Approximately 500 pages of medical records were admitted into evidence at the evidentiary

11    hearing.  (Resp. Ex. 508, 509.)  Though voluminous, these records are of limited benefit in the

12    current competence inquiry.  As far as Mulder's mental impairments are concerned, the reports and

13    evaluations discussed above provide more specific and relevant insight to Mulder's condition and

14    level of functioning.

15    With respect to Mulder's general medical condition, the parties do not dispute that, on March

16    15, 2001, Mulder suffered a  stroke or cerebro-vascular accident (CVA) in the left side of his brain,

17    which is also referred to in the records as a left basal ganglion hemorrhage and a left periventricular

18    intraparenchymal hemorrhage.  (Resp., Ex. 508, R739-42.)  The records further confirm that, as a

19    result of the stroke, Mulder has right side hemiparesis with significant muscle contracture associated

20    with his right wrist and impaired speech identified throughout the records as a dysarthria and/or

21    aphasia.

22    At the evidentiary hearing, both parties sought to elicit testimony regarding Mulder's post-

23    stroke medical care and whether he may have benefitted from various types of therapy.  In the

24    court's view, however, those issues have little bearing on whether Mulder is currently competent

25    under the relevant standard.

26    / / /

14

1           **B. Testimony**

2       The following is an overview of relevant portions of witness testimony given at the

3 evidentiary hearing.

4       1. *Dr. William Noel*

5       Dr. Noel testified that he was contacted Amy Fettig of the ACLU in 2007 "to look at some

6 prison health records and maybe examine some prisoners, and give them an opinion as to the

7 appropriateness of their care." (Docket #68, p. 29.) He explained that, after he had spent several

8 months reviewing the records, Fettig asked him to accompany her on a visit to the prison. (*Id.*, p.

9 30-31.) During that visit, he and Fettig were able to meet with Mulder. *(Id.*, p. 32.)

10       Noel testified that Mulder impressed him as someone who had great difficulty with speech.

11 According to his testimony, Noel was not convinced that Mulder said what he meant to say or

12 understood what Noel was saying to him. (*Id.*, p. 32-33.) He noted that "if you stuck with a very

13 simple single idea, you could pretty well get that idea across and try to extract some information,"

14 but that "once you started to get more than one idea together, or a complexity of ideas together, . . .

15 it was like it was sort of confusing, and there was almost a barrier." (*Id.*, p. 37.) Noel also noted

16 that Mulder spoke with "a great deal of frustration of speech and of enunciation." (*Id.*)

17       On cross-examination, Noel indicated that he was a family practitioner, not a neurologist or

18 psychiatrist. (*Id.*, p. 45.) It was also established that Noel had not been provided all of Mulder's

19 medical records prior to drafting the report discussed above, in which he criticized the treatment

20 Mulder received following his stroke. (*Id.*, p 46-53.)

21       2. *Amy Fettig*

22       Amy Fettig is senior staff counsel at the National Prison Project of the ACLU. (*Id.*, p. 80.)

23 In her testimony, she explained that the FPD had contacted the ACLU in 2007 about the medical

24 care of its clients at ESP, which the FPD felt was interfering with its ability to adequately represent

25 them. (*Id.*, p. 81.) She testified about accompanying Dr. Noel to interview prisoners, including

26 Mulder, about their medical care. (*Id.*, p. 88-90.)

She stated that, of the prisoners they interviewed, Mulder had stuck out in her mind over the years because his case "was so dire and so sad." (*Id*., p. 90.) She also stated that it was very difficult to communicate with Mulder and that she remembered tying to coax answers out of him when it became clear it was difficult for him to understand what they were talking about and, also, to respond to it. (*Id.*, p. 92-93.) As an example of Mulder's difficulty formulating responses to questions, she noted that it took "a very long time" for him to convey to them that he was not using a brace for his contracted wrist because the brace that had been provided did not fit over his gnarled hand. (*Id*.)

Based on her interactions with Mulder, Fettig concluded that, if the ACLU were to bring a class action, Mulder could not serve as a class representative because she did not think that he was not capable of exhausting administrative remedies or making a reasoned judgment on behalf of the class. (*Id*., p. 94-95.) Subsequent to her visit, Fettig sent two or three letters to Mulder and received two responses from him. (*Id*., p. 100.) She explained that she made sure to write to him in the simplest terms possible and asked only easy, yes-or-no questions. (*Id*.) Fettig compared his responses to those of a second or third grader in terms of handwriting and content. (*Id.*, p. 104-105.)

Fettig's impression of Mulder was that, even among the generally low-functioning prison population, he functions "near the bottom." (*Id.*, p. 107.) She also noted that Mulder differed from most prisoners in that, despite his unfavorable circumstances, he was strangely upbeat and happy. (*Id*., p. 108.)

### 3. *Dr. Jethro Toomer*

Dr. Toomer testified about his December 2009 evaluation of Mulder. He stated that Mulder was generally cooperative and attempted to respond to requests for information. (*Id*., p. 116.) He recalled that, at the beginning of the evaluation, Mulder apologized for not being able readily recall information and for his tendency to blurt out words inappropriately. (*Id*., p. 116-17.) Once the evaluation began, Toomer recognized that Mulder's communication processes were limited and that, as a result, information had to be presented to him one idea at a time in simple, concrete terms. (*Id*.,

pp. 117-18, 120-21.)

When asked about the results of the tests he administered, Toomer testified that Mulder's performance duplicating designs in the Bender Gestalt test showed the presence of neurological impairment. (*Id.*, p. 125-28.) With respect to the full scale IQ score of 70, Toomer noted Mulder's areas of weakness "were all in the areas that tapped various dimensions of abstract reasoning ability." (*Id.*, p. 129.)

As for Mulder's prognosis, Toomer indicated that, while there may be "some pockets of improvement," Mulder will not progress significantly beyond his current level of functioning. (*Id.*, p. 137.) When asked how Mulder's cognitive impairments affected his ability to understand these habeas proceedings, Toomer stated:

> I think that what you have here, and what should be pointed out is that what you were talking about, that given his current level of functioning, you're talking about someone whose primary reasoning ability and reasoning process is concrete, so that there is very little, if any, abstract reasoning ability. The individual is able to function and can handle, as we indicated earlier, one kind of, say, instructions; can communicate in a very simple, very basic level. But when you move into the level of abstraction, it becomes very difficult.

(*Id.*, p. 137-38.)

With respect to memory, Toomer suggested that Mulder's long-term memory was likely more reliable than his short-term memory, which is common in stroke victims. (*Id.*, p. 138-39.) Toomer testified that his overall diagnosis of Mulder was that he suffers from a cognitive disorder, not otherwise specified, which is a diagnostic category for individuals who manifest a psychological impairment as a result of some cognitive dysfunction, neurological involvement, or assault to the brain (in this case, a stroke). (*Id.*, p. 144.)

Toomer's direct testimony concluded with a discussion of receptive and expressive aphasia, both of which he found present in Mulder's case. (*Id.*, p. 142-44.) He explained that receptive aphasia has to do with an individual's ability to comprehend and internalize information directed towards him or her, while expressive aphasia has to do with the individual's ability to take that

/ / /

17

information and respond appropriately.  (*Id.*)  According to Toomer, a person with an organic brain impairment that disrupts the "expressive receptive loop" will have difficulty "weighing alternatives, projecting consequences, [and] managing conflicting data."  (*Id.*)

### 4. *Brian Abbington*

Mr. Abbington's direct testimony was presented by way of an affidavit.  (Pet. Ex. 4.)  That testimony was augmented through cross-examination and responses to questions from the court at the evidentiary hearing.  (Docket #69, p. 5-20.)

According to his affidavit, Abbington has been an attorney for 23 years and an AFPD for the last nine years, with a case load consisting entirely of federal capital habeas cases.  (Pet. Ex. 4, p. P0052.)  He has represented Mulder since October 2009 and met with him for the first time on September 29, 2009.  (*Id.*)  Abbington noted that Mulder demonstrates some difficulty talking in that it appears to require "great concentration and effort."  (*Id.*, p. P0053.)  Abbington also noted that Mulder is less frustrated while listening and that he appears to acknowledge his inability to comprehend a discussion "any more complex than his immediate needs, which largely relate to his life in prison."  (*Id.*)  Due to his concerns about Mulder's ability to communicate, Abbington contacted Drs. Kessel and Toomer to examine Mulder and render an opinion as to his competence.  (*Id.*)

On cross-examination, Abbington reported that he had met with Mulder three or four times and that each visit lasted about five and a half hours.  (Docket #69, p. 6.)  He noted that Mulder is very likeable and self-effacing.  (*Id.*, p. 7.)  He compared talking to Mulder with talking to his young granddaughter and explained that, unlike most clients, who typically want to focus on their case, Mulder would typically talk about more mundane, less involved subjects.  (*Id.*, p. 8-9.)  Abbington testified that Mulder's is unable to read or understand legal documents, that he trusts Abbington and understands that Abbington is trying to help him, but that Mulder understands only on the most basic level what is occurring in his case.  (*Id.*, p. 10-19.)

/ / /

1          5. *Dr. Julie Kessel*

2          Dr. Kessel testified about examining Mulder on November 23, 2009, and subsequently

3   witnessing a legal consultation between Abbington and Mulder on March 22, 2011.  She testified

4   that her November 2009 assessment resulted in four primary diagnostic conclusions: Mulder has

5   dementia due to the stroke; he underwent a personality change due to the stroke; he has a poly-

6   substance addiction; and he has receptive, expressive and anomic aphasia and partial paralysis also

7   as a result of the stroke.  (Docket #69, p. 26.)

8          She characterized his aphasia as "moderately severe" because he has the capacity to

9   understand very basic concepts and to communicate very basic concepts, as opposed to severe

10  aphasia where a patient would not be able to communicate at all.  (*Id.*, p. 28.)  She explained that, in

11  eliciting information from Mulder, she had to break each question down into multiple simple

12  questions to make sure he understood the point of what she asking because he was unable to

13  understand a question she might typically ask in an interview.  (*Id.*, p. 29-31.)

14         Kessel also elaborated on her other diagnoses.  She stated that she diagnosed Mulder with

15  dementia because his post-stroke IQ scores, compared to those obtained prior to his stroke, show a

16  decline of cognitive ability as a result of the stroke and that subsequent to the stroke he is

17  functioning intellectually and emotionally at a second grade level.  (*Id.*, p. 32-35.)  With respect to

18  his personality change, she cited to records suggesting that, prior to the stroke, he was "an irritable,

19  impulsive, angry guy, who . . . got into a lot of trouble, made very bad choices, had very low

20  frustration tolerance, [and] was hostile," while subsequent to the stroke, he is happy, jovial, and

21  polite.  (*Id.*, p. 36.)

22         When asked why she had concluded that Mulder was not competent she responded, in part,

23  that Mulder was unable to understand what she was asking him, his responses were off point, that he

24  was unable to manage two concepts presented in one sentence and, that if asked about a legal

25  concept, he perseverated on issues that had emotional importance to him.  (*Id.*, p. 37.)  She noted

26  / / /

19

1    that, "for almost the entirety of the first interview, he perseverated on the role of fingerprints in his

2    case." (*Id*.)

3        She compared Mulder's brain injury to shrapnel going off in his head in the sense that

4    specific areas of the brain have been destroyed or damaged, resulting in specific deficits in specific

5    areas of functioning. (*Id*., pp. 45, 106.) She also noted that it is common for someone who has

6    suffered a brain injury to retain the ability to recall events from their long-term history, but have

7    difficulty forming new memories or have difficulty with their short-term memory. (Id., p. 40.)

8        Kessel also discussed conducting a mental status examination on Mulder and finding that

9    he "was jovial and happy and [in]appropriately giddy, [and] blurted out curse words inappropriately

10   at times," that his "thoughts were poorly organized," and that he "was not able to spontaneously

11   come up with different kinds of things to talk about, except things that impacted his day-to-day life."

12   (*Id*., p. 49) She also noted that he had gross difficulty expressing words and used words

13   inappropriately, which made him difficult to understand and rendered his statements inaccurate.

14   (*Id*.)

15       As for her observations of Mulder's meeting with Abbington, Kessel gave several examples

16   of instances in which Mulder failed to grasp or misunderstood the legal and factual concepts

17   Abbington attempted to discuss with him in relation to his case. (*Id*., p. 57-63.) She also noted that,

18   throughout the interview, Mulder was preoccupied with the fingerprints issue. (*Id*.)

19       Kessel also testified about her impressions of the evaluations of Dr. Bradley and Dr.

20   Piasecki. She did not agree with Dr. Bradley's conclusions because she felt that he was selective in

21   choosing information upon which to base his conclusions and that he presented that information in a

22   way that highlighted Mulder's limited capabilities. (*Id*., p. 76-77.) She also faulted him for using a

23   close-ended approach to the evaluation (by, for example, prompting responses), which, in her view,

24   resulted in conclusions that were based on a limited focus. (*Id*.) As for Dr. Piasecki's evaluation,

25   Kessel noted that her report does not mention aphasia and contains broad conclusions without

26   discussing the information supporting those conclusions. (*Id*., p. 78-79.)

On cross-examination, Kessel conceded that Mulder had been able to report to her facts related to the crimes for which he was convicted and some of his personal history. (*Id*., p. 91-95.) She also indicated that Mulder was aware that he was on death row and that, if his appeals were not successful, he could potentially be executed. (*Id*., p. 95-96.)

6. *Dr. Melissa Piasecki*

Dr. Piasecki testified about her June 2010 evaluation of Mulder. She noted that Mulder's stroke was in a part of the brain that affects both speech and motor ability, which, along with loss of memory, was apparent to her when she examined him. (Docket #71, p. 15.) She stated that it took her ten or fifteen minutes to get used to Mulder's speech pattern, but after that she was able to comprehend what he was saying quite well. (*Id.*, p. 16.) She indicated that Mulder was able to recount his personal history since his stroke in 2001, including some of the difficulties he had encountered and how he was able to adapt to them. He also told her that was no longer able to do certain things like play checkers or the card game "spades" or follow the narratives in books. (*Id.*, p. 16-18.)

According to Piasecki, Mulder related to her that he understood that he had an appeal pending and that his attorneys were attempting to delay his execution through a finding of incompetence. (*Id.*, p. 20.) He also stated that he did not agree with that strategy and, instead, preferred that the appeal be based more on the actual conviction, with the best thing result being a finding of manslaughter and a reduced sentence of 20 years, which would allow him to consider life outside of prison. (*Id.*, p. 20-21.) Piasecki also testified that Mulder was able to recount events in his personal history that occurred prior to his stroke, as well as a chronological history of his substance abuse. (*Id.*, p. 22-24)

Piasecki conducted a mental status examination on Mulder which caused her to conclude that he was capable of abstract thought, but that he had some deficits in that area, especially with respect to more difficult abstractions. (*Id.*, p. 27-32.) She also found that Mulder had "some impairment" of short term memory. (*Id.*, p. 29.) She stated that her primary diagnosis for Mulder was a cognitive

21

disorder secondary to a brain injury, but that she did not necessarily disagree with Kessel's

diagnoses of dementia with expressive, receptive, and anomic aphasia (with the possible exception

of receptive aphasia which Piasecki found less evident).  (*Id.*, p. 37-38.)

When asked her opinion as to Mulder's ability to assist counsel in these proceedings, she

stated:

> Although Mr. Mulder does have some deficits, my finding is that, with some careful wording of questions and patience, he is able to have a conversation, share information, share opinions.  I believe he's able to assist his attorneys.

(*Id.*, p. 42.)  She also testified that, while Mulder did not know the answer to some of her questions,

his responses were generally relevant and logical.  (*Id.*, p. 62-63.)  In her opinion, Mulder has some

difficulty reasoning related partly to memory and partly to attention or concentration, but that his

primary difficulty is in expressing words.  (*Id.*, p. 66-67.)

Similar to Kessel, Piasecki noted that, unlike someone with a disorder such as mental

retardation in which development progresses to a certain level then stops, Mulder progressed to full

development with normal or low average intelligence, then had injuries that knocked out specific

areas of his cognitive functioning, taking those areas down to a lower developmental stage, with

other areas remaining relatively in tact.  (*Id*., p. 92.)  She noted from prison records that Mulder

bought an address book in 2007 and that he buys stamps and greeting cards for various occasions,

which, to her, meant that he had been able to adapt to his memory deficit and was able to track

information and communicate to some extent.  (*Id.*, p. 101.)  She agreed that Mulder's ability to

form abstract thought is somewhat compromised, but noted that "the degree of it might be subject to

interpretation."  (*Id*., p. 104.)

7. *Christopher Oram*

Mr. Oram testified about his representation of Mulder in state post-conviction proceedings.

He recounted going to ESP to meet with Mulder in person and not being able to elicit any

substantive information from him.  (Docket #71, p. 138-39.)  He indicated that he curtailed his visits

with Mulder at ESP because he did not want to charge the State for the trip when he knew he would

1  not have a meaningful conversation.  (*Id.*, p. 145.)

2       Oram testified that when he tried to ask Mulder about what had occurred in his case, Mulder

3  responded with "oh damn," then get flustered and not be able to relate any information.  (*Id.*, p. 146-

4  47.)  He stated that relied on another death row inmate to relay information to and from Mulder

5  about his case.  (*Id.*, p. 147-48.)  Oram indicated that he was unable to have a rational discussion

6  with Mulder about the various issues related to his case.  (*Id.*, p. 151-55.)

7       When asked on cross-examination whether he remembered remember telling the state court

8  that he only met with Mr. Mulder for ten minutes, and then never went back to Ely State Prison,

9  Oram stated that he did not remember telling the court that, but that it sounded accurate.  (*Id.*, p.

10 160.)  However, he also stated that he visited Mulder at High Desert State Prison and during court

11 appearances.  (*Id.*, p. 160-61.)

12      8.  *David Williams*

13      Mr. Williams is a senior correctional officer at ESP stationed on the condemned men's unit

14 (CMU), more commonly known as death row.  (*Id.*, p. 164.)  He testified that, in that capacity, he

15 converses with Mulder occasionally and sees him daily.  (*Id.*, p. 165.)  According to Williams,

16 Mulder typically spends yard time walking around and socializing.  During tier time, he exercises,

17 socializes and occasionally plays cards with other inmates, and routinely cleans his cell.  (*Id.*, p.

18 167-68.)  Williams described his conversations with Mulder as being fairly brief and straightforward

19 with Mulder showing no difficulty in speaking or understanding what is being said.  (*Id.*, p. 169-70.)

20 He noted that Mulder appears "quite comfortable" socializing with other inmates.  (*Id.*, p. 170.)

21      In response to questioning from the court, Williams stated that Mulder has a noticeable

22 speech impediment which he assumes is related to his apparent physical impairments.  (*Id.*, p. 180.)

23 On cross-examination, he indicated that his conversations with Mulder are generally confined to

24 Mulder's basic wants and needs.  (*Id.*, p. 183)

25      9.  *Harry Peltzer*

26      Mr. Peltzer is a caseworker at ESP, whose job mainly consists of classifying inmates and

1   preparing them for release.  (*Id*., p. 184-85.)  He testified that he sees Mulder on the tier or in the

2   yard a few times a month and that, during yard time, he is either visiting with other inmates or

3   exercising and, during tier time, he is either conversing with other inmates, walking on the tier in a

4   small group, or playing cards.  (*Id*., p. 186-87.)  He further testified that he rarely communicates

5   with Mulder and, when he does, it is usually a very simple discussion.  (*Id.*, p. 188.)   During those

6   conversations, Peltzer understands what Mulder says to him and it appears to Peltzer that Mulder

7   understands what Peltzer says to him.  (*Id.*)

8           10.  *Dr. Lindell Bradley*

9           Dr. Bradley testified about his June 2010 evaluation of Mulder.  He noted that Mulder

10   displayed expressive aphasia, but that Mulder was able to explain to him the purpose of the

11   evaluation.  (Docket #72, p. 6.)  Bradley stated that Mulder has difficulty with fluency and clearly

12   articulating words that he is trying to express, but that, with assistance, Mulder was able "to pretty

13   fully express himself, to the extent that he was able to communicate reasonably complex

14   and abstract notions."  (*Id*., p. 8.)  He explained that "with assistance" meant that he needed to be

15   patient and that, when Mulder said something that was not clear, he would ask him in his own

16   words, "if he intended to say this or that," to which Mulder would "indicate yes or no."  (*Id.*, p. 8-9.)

17   Bradley stated that Mulder seemed "truly interested" in expressing his independent thoughts, rather

18   than just agreeing with whatever Bradley said.  (*Id*., p. 9-10.)

19           Bradley testified that Mulder complained about having a bad memory, although Bradley

20   thought Mulder "seemed to have a pretty good memory and be able to convey quite a bit of detailed

21   information."  (*Id.*, p. 11.)  Bradley indicated that a factor that lead him to conclude Mulder was

22   competent to assist counsel was that Mulder was able to respond to a question about the ideal

23   outcome of the appeals process in a manner that showed Mulder was able think abstractly and

24   consider alternatives that were better than his current situation and within the realm of possibility.

25   (*Id.*, p. 11-12.)  That factor combined with Mulder's memory and description of details related to his

26   recent past and his more remote past showed Bradley that Mulder had a good ability to both

1   understand questions and communicate complex information and to do so in a manner that was

2   organized and in good detail with regards to things he could recall.  (*Id.*, p. 13.)

3        Bradley's clinical assessment of Mulder's memory, based on Mulder' responses to questions

4   and information he volunteered, showed good recall of recent events and a good understanding of

5   his situation, as well as a good comprehension of information and good retention of information.

6   (*Id.*, p. 20.)   Bradley also noted that Mulder was able answer questions in a goal-directed manner,

7   which meant that he was "on target" with regard to the nature of his answer and that he was able to

8   put his answer together "in an appropriately sequenced way to have good meaning."  (*Id.*, p. 21.)

9        When asked to give examples of Mulder's ability to convey complex ideas, Bradley noted

10   that Mulder had told him that his brother had died of AIDS, and that he had contracted AIDS as a

11   result of being homosexual, which showed that Mulder was able to grasp the concept that being

12   homosexual was a high risk factor for contracting AIDS.  (*Id.*)   Another example he gave was that

13   Mulder was able to describe his substance abuse, including IV use, and to volunteer that he had been

14   tested for HIV and hepatitis C, which showed that he understood the concept that IV drug use can

15   infect one with both AIDS and hepatitis.  (*Id.*, p. 21-22.)   As a third example, Bradley cited Mulder's

16   complaints about the fingerprint evidence in his case, wherein he was able to express the idea that if

17   the judge had not allowed the expert to be qualified as an expert, his testimony would not have been

18   allowed and, therefore, the fingerprints would not have been discovered.  (*Id.*, p. 22.)   Finally,

19   Bradley referred again to Mulder's response to his question about ideal outcomes to his appeal

20   which included scenarios that would be acceptable to him, as opposed to continuing on in a

21   maximum security prison.  (*Id.*)

22        Bradley also testified that Mulder expressed positive thoughts about his current attorney and

23   trusted his attorney to work hard on his behalf, which Bradley considered a factor in the competency

24   analysis because, in some cases, a defendant may have the cognitive skills to assist his attorney, but

25   be prevented from doing so due to psychotic thoughts or delusions about the attorney.  (*Id.*, p. 24-

26   25.)   According to Bradley, Mulder also expressed a desire for his attorney to focus on the

1   conviction itself, rather than trying to have the death sentence set aside.  (*Id.*, p. 25-26.)

2   When asked about Dr. Kessel's conclusions, Bradley disagreed that Mulder's cognitive

3   impairments rose to the level of dementia.  (*Id.*, p. 28-30.)  Also, while he noted some receptive

4   aphasia, he felt Mulder's receptive impairments were quite mild and were pretty easily compensated

5   for by, for example, slowing down and then clarifying or restating for Mulder what he was trying to

6   express.  (*Id.*, p. 30-31.)  With respect to Dr. Toomer's report, Bradley questioned the relevance and

7   accuracy of IQ scores in Mulder's case because the tests have not been standardized for use on

8   people who have "the very specific and, oftentimes, narrow set of deficits that are associated

9   with a stroke."  (*Id.*, p. 32.)  He further explained that a person who attains average intelligence as an

10  adult, then tests at an IQ score of 70 after a stroke will have far higher functional capacities than

11  someone who has an IQ of 70 from birth.  (*Id.*, pp. 33-34, 52.)

12  On cross-examination, Bradley stated that Mulder has difficulty expressing complex ideas,

13  suffers from cognitive slowing (i.e., his cognitive processing of information is slowed down), and

14  that he demonstrates deficits in the comprehension of complex and detailed information.  (*Id.*, pp.

15  45, 58, 72.)  He explained that his conclusion that Mulder had a good understanding of the legal

16  process was based upon Mulder's ability to describe what he had been convicted of, why he had

17  been sentenced to death, and that he was in the process of appealing that with the assistance of his

18  attorney.  (*Id.*, p. 62.)  In addition, Bradley stated that Mulder was able to clearly identify the roles of

19  the defense attorneys, prosecuting attorneys, and judge, describe the process and purpose of the plea

20  bargain, and discuss and identify what witnesses are, what evidence is, and what juries do.  (*Id.*)

21  **III.   LEGAL STANDARD**

22  Under 18 U.S.C. § 3599(a)(2), state inmates sentenced to death have the right to counsel in

23  their federal habeas proceedings.  The Ninth Circuit has read into that provision the additional right

24  to be competent to assist that habeas counsel.  *Rohan*, 334 F.3d at 813.  Competence for *Rohan*

25  purposes means the petitioner has "the capacity to understand his position and to communicate

26  rationally with counsel."  *Id.* at 819.  Because Mulder's counsel admittedly makes no claim that

1   Mulder lacks the capacity to understand his position or current circumstances (docket #42, p. 10-11),

2   the analysis in this case is focused on the "rational communication" prong of the *Rohan* test.

3        In his pre-hearing brief, Mulder's counsel contends that Mulder is incompetent unless he is

4   able to:

5        . . . understand the current legal situation; understand the nature of the charges against
         him; understand relevant facts; understand legal issues and procedures; understand
6        potential defenses; understand the possible dispositions, pleas, and penalties; appraise
         the likely outcome; appraise the roles of defense counsel, prosecutor, judge, jury,
7        witnesses and petitioner; identify witnesses; relate to counsel in a trusting and
         communicative fashion; comprehend instructions and advice; make decisions after
8        receiving advice; maintain a collaborative relationship with counsel and help plan
         legal strategy; follow testimony for contradictions or errors; testify relevantly and be
9        cross examined if necessary; challenge prosecution witnesses; tolerate stress during
         court appearances and while awaiting court appearances; disclose pertinent facts
10       surrounding the alleged offense; and protect himself and utilize available legal
         safeguards.

11

12  Docket #53, p. 4.  Mulder cites no legal authority for such a broad and exacting test for determining

13  competence in *any* context, much less a federal habeas proceeding.  And, as the State points out in

14  its response brief, a habeas proceeding does not require as much participation or input from the

15  client as a criminal trial and typically does not implicate several of these factors.  Docket #56, p. 2-3.

16  While the specific scope of the *Rohan* competence standard has not been clearly defined by the

17  Ninth Circuit, the requirement that the petitioner "understand his position" is presumably part of the

18  test so that the petitioner make fundamental decisions about the course of the litigation, while the

19  "rational communication" requirement ensures that the petitioner can comprehend counsel's advice

20  and also relate the facts necessary to advance his habeas claims.

21       In determining a petitioner's competence, it is reasonable for the court to consider counsel's

22  observations and evaluations of the petitioner.  *Medina v. California*, 505 U.S. 437, 450 (1992)

23  (citing *United States v. David*, 511 F.2d 355, 360 (D.C. Cir.1975); *United States ex rel. Roth v.*

24  *Zelker*, 455 F.2d 1105, 1108 (2nd Cir.1972)).  The court can also consider the observations of

25  witnesses in long term daily contact with petitioner in addition to, or rather than, conclusions of

26  ///

1   expert witnesses based on relatively brief periods of examination.  *United States v. Birdsell*, 775

2   F.2d 645, 651 (5th Cir. 1985).

3          In *Nash v. Ryan*, 581 F.3d 1048, 1050, 1055 (9th Cir. 2009), the Ninth Circuit extended the

4   right to competence in a federal habeas proceeding to federal appellate proceedings notwithstanding

5   the "record-based nature of an appeal."  More recently, in *In Re Ernest Valencia Gonzalez*, 623 F.3d

6   1242, 1244 (9th Cir. 2010), the court held that a *Rohan* stay was available in a federal district court

7   proceeding even when the "claims are record-based or legal in nature."  The *Gonzalez* court stated as

8   follows:

9          . . . Rather than relying upon categorical rules, *Nash* made clear that the "inquiry
           should be whether rational communication with the petitioner is essential to counsel's
10         ability to meaningfully prosecute" a capital habeas claim.  *Id*. at 1054.  Had the
           district court undertaken the claim-specific inquiry required by *Nash*, he would have
11         been compelled to conclude that "communication with [Gonzales] is essential to
           counsel's ability to meaningfully prosecute" Gonzales's habeas claims.  *Id*. . . .
12

13   *Gonzalez*, 623 F.3d at 1245.  More recently, in *Blair v. Martel*,  645 F.3d 1151, 1156-57 (9th Cir.

14   2011), the court recognized that a competency determination is not necessary when a habeas petition

15   raises "only claims for relief that fail as a matter of law."

16          As to the burden of proof, the court in *Blair* adopted the same procedures set forth in *Mason*

17   *ex rel. Marson v. Vasquez*, 5 F.3d 1220 (9th Cir. 1993), a case involving a death-sentenced state

18   prisoner who wanted to abandon his federal habeas petition during the course of those proceedings.

19   *Blair*, 645 F.3d at 1154.  Those procedures were explained as follows:

20         When a habeas petition has been filed in the federal district court, appropriately
           invoking the court's jurisdiction and the mental competency of the petitioner is
21         reasonably questioned, it is the obligation of the court to determine the petitioner's
           mental competence.  Initially sufficient evidence must be presented to cause the court
22         to conduct an inquiry.  After that point it is no one's burden to sustain, rather it is for
           the court to determine by a preponderance of the evidence whether the petitioner is
23         mentally competent to withdraw his petition.

24   *Id*. at 1154-55 (quoting *Mason*, 5 F.3d at 1225).

25          For reasons set forth in this court's order of January 11, 2011, Mulder has made an initial

26   showing sufficient to warrant a competency determination.  Docket #43.  Thus, at this point, neither

28

1   party carries the burden of proof on the issue of competence.  Instead, the court must determine by a

2   preponderance of the evidence whether the petitioner is mentally competent to prosecute his petition.

3   *See Blair*, 645 F.3d at 1155.

4      **IV.   ANALYSIS**

5          Mulder contends that claims in the petition alleging ineffective assistance of counsel are

6   claims that would benefit from Mulder's ability to rationally communicate with counsel.  (Docket

7   #18, p. 9.)  The court notes that Mulder's amended habeas petition does, in fact, contain claims of

8   ineffective assistance of counsel, including a claim that trial counsel failed to investigate and present

9   available mitigating evidence in the penalty phase of his trial.  In light of the very broad approach

10  taken by the court of appeals in *Nash* and *Gonzalez*, this court is compelled to conclude that Mulder

11  has raised at least one claim that meets this threshold requirement.  As noted above, Mulder

12  concedes that he understands his current position.  Thus, the remaining question for the court to

13  decide is whether Mulder has the capacity to communicate rationally with counsel.

14         The stroke Mulder suffered in March 2001 left him with significant physical and mental

15  impairments.  As to the latter, there is general agreement among the mental health experts that

16  Mulder's cognition, memory, and ability to communicate were negatively impacted by the stroke,

17  while his general disposition and mood were likely improved.  The problem confronted by the court

18  is that the opinions of the experts differ as to the severity of Mulder's impairments and the extent to

19  which they impact his capacity to rationally communicate with counsel.

20         As an initial matter, the court gives little weight to the overall results of the IQ tests

21  administered to Mulder, which placed his full-scale IQ at or near 70.  The testimony and evidence

22  establish that Mulder's non-intelligence related impairments adversely affected his performance on

23  these tests.  In addition, various experts took care to point out that the overall functional capacity of

24  someone who is born with an IQ of 70 will be significantly lower than someone like Mulder, who

25  attained at least low average intelligence as an adult, then tested at 70 subsequent to a brain injury.

26  / / /

1   It is noteworthy that Dr. Kessel and Dr. Piasecki both described the impact of Mulder's

2   stroke in very similar terms  – i.e., that it knocked out specific areas of cognitive functioning while

3   having little or no impact with respect to other areas.  Practically all of the experts discussed above

4   found or conceded that Mulder is afflicted with some degree of expressive and receptive aphasia.

5   Dr. Kessel characterized Mulder's aphasia as "moderately severe," meaning that he is only able to

6   understand very basic concepts and to communicate very basic concepts.  Dr. Toomer and Dr.

7   Kinsora also emphasized Mulder's aphasia and its impact on his ability to process incoming

8   information and respond appropriately.

9   On the other hand, Dr. Bradley noted that Mulder has difficulty with fluency and articulating

10   words, but that, if assisted, he can communicate reasonably complex and abstract notions.  Both Dr.

11   Bradley and Dr. Piasecki discounted the severity of Mulder's receptive aphasia and concluded that it

12   could be overcome by speaking to him more slowly and, if necessary, by clarifying or rephrasing

13   what one is saying to him.  Both also noted that Mulder's responses to their questions were on point

14   and logical.

15   With respect to Mulder's memory, it is apparent that from the numerous reports and

16   testimony of the mental health experts that Mulder can recall and relate a substantial portion of his

17   personal history and various events from his past.  Dr. Toomer and Dr. Kessel both noted that, given

18   the nature of his injury, it is likely that Mulder's long-memory is better than his short-term and

19   working memory.  Even so, Dr. Kessel, Dr. Linsora, and even Dr. Milner all questioned Mulder's

20   ability to recall and relate specific information about past events.  On the other hand, neither Dr.

21   Piasecki nor Dr. Bradley were convinced that Mulder's long term memory is more than mildly

22   impaired.

23   Each of the attorneys who have interacted and testified at the evidentiary hearing noted

24   similar problems in communicating with Mulder.  Ms. Fettig and Mr. Abbington both noted

25   significant difficulty in eliciting information from Mulder, partly due to Mulder's inability to

26   understand the question posed and partly due to the effort required for him to formulate an answer.

1   Mr. Abbington and Mr. Oram both testified about their inability to discuss with Mulder substantive

2   issues related to his case.  Dr. Noel's testimony corroborated the testimony of the attorneys by

3   noting Mulder's difficulty with speaking and his apparent inability to comprehend more complex

4   ideas.

5          In the court's view, the testimony of Mr. Peltzer and Mr. Williams is not particularly helpful

6   in assessing whether Mulder is competent under *Rohan*.  Both indicated that their conversations with

7   Mulder are typically brief and confined to subject matter that is simple and straightforward.  While

8   both noted that Mulder frequently socializes and plays cards with other inmates, neither provided

9   any specific details about those interactions.

10         In light of the foregoing, the court concludes that Mulder is capable of *some level* of rational

11   communication with counsel.  Mulder is able to logically respond to questions, especially when they

12   are simplified or broken down into parts.  He is able to remember and convey to counsel information

13   about his background and occurrences in his recent and remote past.  In addition, at least some of the

14   mental health experts are convinced that he his capable thinking and communicating, to some extent,

15   on an abstract level.  This court notes, however, that the Ninth Circuit's opinion in *Rohan* and its

16   subsequent opinion in *Nash* condition competence on the capital habeas petitioner's ability to

17   "provide first-hand insight into the earlier proceedings," which, depending on the type of claim at

18   issue, might include the ability to "identify aspects of his personal history that should have been, but

19   were not, elicited [by trial counsel]," to "testify about the extent of his trial counsel's efforts to elicit

20   that mitigating evidence from him," to "direct counsel to circumstantial evidence of his

21   incompetence at the time [of trial]," and to "offer his side of the story" with respect to his

22   interactions with trial counsel.  *Nash*, 581 F.3d at 1056; *Rohan*, 334 F.3d at 818.

23         The evidence before the court does not support a finding that Mulder is capable of rationally

24   communicating on a level that would allow him to impart information of this type to counsel.  While

25   it may be unrealistic to expect a habeas petitioner to remember all the details of a proceeding that

26   occurred more than thirteen years ago, Mulder's impairments allow him to convey only the most

31

1   basic and selective information about what occurred during his trial, what interactions he may have

2   had with trial counsel, or what evidence from his background counsel should have introduced in

3   mitigation.  The various reports in the record, as well as testimony of both expert and lay witnesses,

4   cast considerable doubt on Mulder's ability to comprehend questions from counsel that are not

5   phrased in simple, concrete terms.  And, although there is evidence that Mulder is able to

6   spontaneously provide information about his case, he seems to dwell on certain issues to the

7   exclusion of others.  Several witnesses also testified that Mulder's difficulties in expressing himself

8   and choosing the right words made them question the accuracy of what he was saying.  Applying the

9   burden of proof mandated by the court in *Blair*, the preponderance of the evidence does not support

10  a finding that Mulder is capable of the level of rational communication necessary to find him

11  competent under *Rohan* and *Nash*.  Accordingly, these proceedings shall be stayed until Mulder is

12  competent.

13      **IT IS THEREFORE ORDERED** that petitioner's motion to stay federal habeas corpus

14  proceedings (docket #18) is GRANTED.

15

16      DATED:  September 26, 2011.

17

18  _____

19  PHILIP M. PRO
    United States District Judge

20

21

22

23

24

25

26