UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Michael J. Mulder,

              Petitioner

v.

Jeremy Bean,[1] et al.,

              Respondents

Case No. 3:09-cv-00610-CDS-CSD

**Order Conditionally Granting
Petition for Writ of Habeas Corpus**

[ECF No. 165]

Before me for a decision on the merits is the second amened petition for writ of habeas corpus under 28 U.S.C. § 2254 brought by Michael Mulder, a Nevada prisoner sentenced to death. ECF No. 165. In deciding respondents' motion to dismiss the petition, the court determined that only three claims are not subject to dismissal as either untimely filed or procedurally defaulted: Claim One alleging that the Supreme Court of Nevada failed to provide close appellate scrutiny after invalidating to aggravating circumstances found by the jury in the penalty phase of Mulder's trial, Claim Six challenging the premeditation instruction given in the guilt phase of Mulder's trial, and the portion of Claim Twelve alleging that Mulder's appellate counsel provided ineffective assistance by failing to challenge the premeditation instruction. *See* ECF No. 206. The court dismissed all of Mulder's remaining claims except for certain procedurally defaulted ineffective assistance of trial counsel claims for which Mulder argues the default should be excused under the holding in *Martinez v. Ryan*, 566 U.S. 1 (2012). *Id.*

Having considered the briefing on the remaining claims, I grant conditional habeas relief as to Claim One, deny relief on Claims Six and Twelve, and conclude that Mulder cannot meet the *Martinez* standard with respect to the defaulted ineffective assistance of trial counsel claims.

---

[1] Petitioner is currently incarcerated at High Desert State Prison. Thus, Jeremy Bean, the warden of that facility is substituted for William Gittere as the primary respondent in this case. *See* Fed. R. Civ. P. 25(d); *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

I.      Background[2]

In February 1998, a jury sitting in the Eighth Judicial District Court for Nevada returned verdicts finding Michael Mulder guilty of (1) first degree murder, (2) robbery (victim 65 years of age or older), and (3) burglary while in possession of a firearm. After a penalty phase hearing, Mulder was sentenced to death for the murder. The jury found the following aggravating circumstances for the murder: (1) the murder was committed while Mulder was engaged in the commission of or an attempt to commit burglary (2) the murder was committed while Mulder was engaged in the commission of or an attempt to commit robbery, and (3) Mulder was previously convicted of two violent felonies.

The Supreme Court of Nevada described the facts of this case as follows:

> In July 1996, Mulder and his girlfriend, Kimberly Van Heusen, were visiting Las Vegas, Nevada, and were staying at the 49er Motel, near the Showboat Casino. During this time, the couple consumed drugs, and Van Heusen often prostituted herself to obtain money for drugs while Mulder sometimes worked day jobs on construction sites.
>
> On Sunday, July 7, 1996, Van Heusen was gambling at the Showboat Casino when she met seventy-seven-year-old John Ahart in the early afternoon. The two drank, gambled, and spent time together at the Showboat for about two hours. Ahart won $80.00, and they agreed to split the money. Van Heusen and Ahart left the Showboat and went to a restaurant, an ATM machine, and a liquor store before finally arriving at Ahart's home in a senior citizen mobile home park. There, they continued to drink and spend time together until Ahart drove Van Heusen back to her motel in his maroon 1990 Infiniti coupe. Because Ahart spent the money he won, he asked Van Heusen to return the next day to receive the $40.00 he owed her.
>
> On Monday, July 8, 1996, Mulder and Van Heusen took the bus to Ahart's home, arriving about 8 a.m. Ahart let the couple in and gave Mulder a beer and Van Heusen her $40.00. While there, Mulder apparently looked through Ahart's belongings. At some point, Mulder indicated to Van Heusen that he wanted to return to Ahart's house "to look around," which Van Heusen interpreted as Mulder's intention to steal from Ahart. After approximately one-half hour, Ahart had to leave to do some errands. He gave Mulder and Van Heusen a ride in his Infiniti, dropping Mulder off a short distance from Ahart's home so he could look for a job and dropping Van Heusen off near her motel.

---

[2] This section is derived from exhibits filed by the respondents (ECF Nos. 127–137, 175–176) and this court's own docket.

Approximately an hour and one-half later, Van Heusen was in the motel room when she heard loud honking outside. Mulder was sitting in a maroon 1990 Infiniti coupe with the motor running, honking, and yelling for Van Heusen to grab their stuff and hurry up. Mulder appeared upset and nervous and told Van Heusen that he had stolen the car. Mulder's right hand was injured, and when Van Heusen asked him how that happened, Mulder replied that he had been in a "struggle." Van Heusen noticed that Mulder was wearing a new watch and that a wooden jewelry box was in the back seat of the car. Mulder then drove with Van Heusen to Phoenix, Arizona, where his family lived. Mulder later told Van Heusen that he had stolen a gun from the person with whom he had struggled, but had disposed of the gun and had not used it.

On Thursday, July 11, 1996, Mulder and Van Heusen arrived in the Infiniti at the residence of Mulder's sister, Lisa, who turned them away. They then drove to the house of Mulder's brother, Craig, who helped Mulder and Van Heusen get a motel room. Craig asked Mulder where he got the Infiniti, and Mulder replied that it was "hot." When Craig noticed the injury to Mulder's hand, Mulder replied that he got hurt in a "fight" because "the other guy" owed Van Heusen money and that he had injured his hand on "the other guy's head."

Also on July 11, 1996, Jay Ahart, Ahart's son, arrived at Ahart's home after receiving a call from Ahart's neighbor indicating that something was wrong. Jay entered the home through the back door and found his father lying dead in a pool of blood on the dining/living room floor. Ahart's ankles were bound together and his wrists were tied behind his back with duct tape. A chair had been placed over Ahart's body in an apparent attempt to conceal it from view. Jay discovered that his father's gun, watch, jewelry box, and car were missing.

The medical examiner later testified at trial that when discovered, Ahart had already been dead for a few days and the body was partially decomposed. Ahart suffered a crushed left cheekbone and several severe scalp lacerations, including a fifteen-inch hinge fracture from the front of the skull extending around back to the base of the skull. The medical examiner also pointed out several fragmentations and depressions around the skull and indicated there was hemorrhaging inside the scalp. The dura mater, a membrane encasing the brain, was torn. Overall, the medical examiner testified that Ahart died from massive head injuries due to severe impact trauma caused by multiple high-force blows from a blunt object.

The police found fingerprints in Ahart's home belonging to Van Heusen. Also, through a complicated method involving ultraviolet light, the crime scene analysts were able to lift fingerprints off the duct tape used to bind Ahart's ankles and wrists. The fingerprint expert in Las Vegas determined that those fingerprints did not belong to either Ahart or Van Heusen, but he could neither include nor exclude Mulder as the person who left those prints. After consulting his Las Vegas colleagues, who also could not accurately identify the fingerprints, the fingerprint examiner sent the prints to the FBI fingerprint laboratory.

Robert Witt, the head of the FBI lab, testified as an expert witness that the lab was equipped to identify the most difficult prints in the country and that much of his work was from local police departments whose own experts have little experience in identifying such difficult prints. Witt, who had thirty-five years of fingerprint comparison experience with the FBI, testified that without the use of sophisticated equipment he was able to positively identify the prints from the duct tape as belonging to Mulder. His identification was verified by other FBI fingerprint examiners.

Approximately two weeks after obtaining the Infiniti, Mulder somehow disposed of the car. A short time after that, on August 16, 1996, a man (not Mulder) attempted to register the car in Phoenix. The automobile title examiner verified that this was the same car that was stolen from Ahart, and when she attempted to delay the man from leaving the office, he became nervous and left.

On September 9, 1996, Van Heusen spoke to her mother for the first time since July 1996. After her mother gave her certain information, Van Heusen became upset and asked Mulder if he killed Ahart on July 8, 1996. Mulder expressed surprise that Ahart was dead and explained to Van Heusen that he had had to struggle with Ahart because "[Ahart] should have done what he was told."

*Mulder v. State*, 992 P.2d 845, 848-49 (Nev. 2000) (footnote omitted).

Mulder timely appealed his conviction and sentence to the Supreme Court of Nevada. On January 18, 2000, the Supreme Court of Nevada affirmed Mulder's conviction with the opinion excerpted above. Mulder filed a petition for rehearing which was denied. His petition for writ of certiorari to the United States Supreme Court was also denied.

In January 2001, the state district court appointed Christopher R. Oram as post-conviction counsel for Mulder. In May 2001, Oram filed a petition for writ of habeas corpus in the state district court, then, in July 2001, a supplement to the petition. While that proceeding was pending, Oram also filed a motion to reverse the sentence of death due to a stroke Mulder suffered in March 2001 at Ely State Prison. The state district court ordered psychological testing and subsequently, in October 2004, denied the motion.

In January 2005, Oram filed a motion to stay all habeas proceedings until Mulder was found competent to assist counsel. The state district court held an evidentiary hearing in March 2005 and found Mulder competent to assist counsel and to proceed with the state habeas proceedings. In February 2006, the court entered an order denying Mulder's ineffective assistance

4

of counsel claims on the merits and procedurally barring his other claims but granting penalty phase relief based on *McConnell v. State*, 102 P.3d 606 (Nev. 2004).[3]

Both the State and Mulder appealed. In June 2009, the Supreme Court of Nevada entered an order reversing the state district court's decision to grant relief under *McConnell* and affirming the lower court's decision to find Mulder competent and to otherwise deny relief. Mulder filed a petition for rehearing that was denied in September 2009.

On October 15, 2009, Mulder filed a petition for writ of habeas corpus in this court, which initiated this proceeding. On January 20, 2010, appointed counsel, the Federal Public Defender's office (FPD), filed an amended petition.

In February 2010, the FPD moved for a stay under *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), which, at the time, required a court to stay capital habeas proceedings upon a showing that the petitioner is incompetent. Following an evidentiary hearing, this court granted the motion in September 2011. The respondents appealed.

While the appeal was pending, the U.S. Supreme Court decided *Ryan v. Gonzales*, 568 U.S. 57 (2013), which abrogated *Rohan*. As a result, the Ninth Circuit remanded this case for consideration under *Gonzales*. Finding a stay no longer appropriate under *Gonzales*, this court directed respondents to file a response to Mulder's amended habeas petition.

In the meantime, Mulder moved this court to reconsider its decision to lift the stay, which the court denied. Mulder's subsequent petition for a writ of mandamus challenging the denial in the Ninth Circuit was also denied.

In August 2013, respondents filed a motion to dismiss claims in Mulder's amended petition. Rather than respond to the motion, Mulder filed a motion for summary judgment on Claim One of his amended petition and a motion for stay and abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005). This court denied the motion for summary judgment but granted the motion for stay. The court also denied the motion to dismiss without prejudice as moot.

---

[3] The Supreme Court of Nevada's application of *McConnell* to Mulder's case is explained below in my discussion of Claim One.

In December 2014, Mulder filed his second state habeas petition. The state district court denied the petition as procedurally barred. On appeal, the Supreme Court of Nevada affirmed the lower court, finding the second state petition untimely filed under NRS 34.726, second and successive under NRS 34.810, and barred by laches under NRS 34.800. Mulder's subsequent petition for writ of certiorari with the U.S. Supreme Court was denied on March 25, 2019.

In May 2019, this court granted Mulder's motion to reopen these proceedings and allowed him time to file a second amended petition. Mulder filed the petition on August 15, 2019. In February 2020, the respondents filed the motion to dismiss discussed in the Section 1, above. In deciding that motion, the court also denied motions for leave to conduct discovery and for an evidentiary that Mulder had filed in relation to the motion to dismiss. Respondents filed their answer to the petition in October 2022. In May 2023, Mulder filed his reply, accompanied by another motion for discovery and motion for an evidentiary hearing. I denied those motions in September 2024. I now address Mulder's remaining claims.

II.     Discussion

        A.  Claim One—Close Appellate Scrutiny

In Claim One, Mulder alleges that his constitutional rights were violated when the Supreme Court of Nevada failed to provide close appellate scrutiny of his death sentence after invalidating two of the aggravating circumstances that were found by the jury. In Mulder's first state post-conviction proceeding, the state district court invalidated the robbery and burglary circumstances based on the holding in *McConnell* that it is "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated." *McConnell*, 102 P.3d at 624. Concluding that error was not harmless beyond a reasonable doubt, the state district court set aside Mulder's death sentence. ECF No. 136-17. On appeal, the Supreme Court of Nevada confirmed that the aggravating circumstances were invalid under *McConnell* but concluded that the lower court had erred in finding that the error was not harmless. ECF No. 137-22 at 7–10.

Here is the relevant passage:

> The State concedes that the district court properly struck two of the aggravating factors—those based on robbery and burglary—under <u>McConnell</u> because they were alleged as the predicate felonies to support a felony-murder theory of first-degree murder and the jury's verdict did not specify the theory upon which it convicted Mulder of first-degree murder. Nevertheless, the State complains that the district court the district court failed to engage in the required reweighing of the valid aggravating circumstances and the mitigating circumstances before vacating the death sentence and erred in vacating Mulder's death sentence. We conclude that the record before us, in particular the district court's order, show that the district court engaged in a reweighing analysis. However, we conclude that the district court erred by determining that the McConnell error was not harmless.[3]
>
> When reweighing the remaining aggravating and mitigating circumstances, this court conducts de novo review, <u>State v. Haberstroh</u>, 119 Nev. 173, 184, 69 P.3d 676, 683 (2003), because reweighing does not require any factual determinations. <u>Rippo v. State</u>, 122 Nev. 1086, 1091, 146 P.3d 279, 283 (2006) (acknowledging that review of "the <u>McConnell</u> issue presents questions of law that do not require factual determinations outside of the record."). To uphold a death sentence after striking an invalid aggravator, this court must be able to conclude beyond a reasonable doubt that the jury would have: (1) found the defendant death eligible and (2) imposed death absent the erroneous aggravating circumstances. If the court cannot make that determination, then a new penalty hearing is required. See <u>Browning v. State</u>, 120 Nev. 347, 363-64, 91 P3d 39, 51 (2004); <u>Leslie v. Warden</u>, 118 Nev. 773, 784, 59 P,3d 440, 448 (2002): <u>Haberstroh</u>, 119 Nev. 183, 69 P.3d at 683.
>
> First, the jury did not specifically find any mitigating circumstances and therefore, there are no mitigating circumstances to weigh against the two remaining valid aggravators in this case. After striking the robbery and burglary aggravating circumstance, two aggravating circumstances remain: Mulder's previous convictions for felonies involving the use or threat of violence against the person of another. See NRS 200.033(2)(b). The two remaining aggravators concern prior felony convictions involving the use or threat of violence—two armed robberies—and the State relied heavily on those aggravators in the penalty phase, contending that the victim's murder was the culmination of an increasingly violent criminal career. Moreover, the stricken aggravators involved the circumstances of the crime itself and thus, the jury would have been privy to all of the facts underlying these aggravators regardless of whether they were used as aggravators. See <u>Rippo</u>, 122 Nev. At 1093, 146 P.3d at 284 (noting that striking multiple felony aggravators that were based on the underlying circumstances of the crime eliminated "the weight of roughly one major aggravator"). Thus, because the prosecutor emphasized Mulder's prior felony convictions, we conclude that the invalid felony aggravators would have had less impact on the jury's decision than the two remaining valid factors. Therefore, we conclude that the jury would have found Mulder to be death eligible based on these two remaining aggravators.

Second, we conclude that the jury would have imposed a sentence of death absent the invalid aggravating factors because the facts of this crime a particularly heinous and involve the robbery and brutal murder of an elderly victim and the State presented victim impact testimony from Ahart's nephew and son describing the impact the crime had on them and their family. Under these circumstances, we conclude that the jury's consideration of the two invalid felony aggravators was harmless beyond a reasonable doubt and therefore we reverse the district court's order vacating the death sentence.

_____

[3] We further reject Mulder's contention that this court lacks the authority to reweigh the aggravating and mitigating factors. This court's authority to reweigh the aggravating and mitigating factors after an aggravator has been stricken is firmly established by case law from this court and the United States Supreme Court. See Browning v. State, 120 Nev. 347, 363, 91 P.3d 39, 51 (2004); Chappell v. State, 114 Nev. 1403, 1410 (1998); see also Clemons v. Mississippi, 494 U.S. 783, 741 (1990) ("[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless error review.").

Id. (additional footnote omitted).

As noted in the Supreme Court of Nevada's footnote, when an aggravating circumstance is invalidated, a reviewing court may, short of remanding for re-sentencing, either re-weigh the mitigating evidence against the remaining aggravating factors or determine whether the sentencer's consideration of the invalid factor or factors was harmless error. *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). In condoning the use of re-weighing by the state appellate court, the Court in *Clemons* stated:

We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant. It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed.

*Clemons*, 494 U.S. at 748–49. The Court also held that an appellate court is able to adequately assess any evidence relating to mitigating factors such that the re-weighing process can survive constitutional scrutiny where the appellate court is "without the assistance of written jury findings." *Id.* at 750. "If a court conducts a reweighing analysis, it must provide 'close appellate

8

scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases.'" *Bejarano v. Reubart*, 136 F.4th 873, 908 (9th Cir. 2025) (quoting *Stringer v. Black*, 503 U.S. 222, 230 (1992)).  If, on the other hand, the state court conducts a harmless error analysis, it must find "beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance." *Valerio v. Crawford*, 306 F.3d 742, 756 (9th Cir. 2002) (en banc). "Even when other valid aggravating factors exist, merely affirming a sentence reached by weighing an invalid aggravating factor deprives a defendant of 'the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances.'" *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (quoting *Clemons*, 494 U.S. at 752).

Mulder argues that the Supreme Court of Nevada clearly erred in finding that the jury found no mitigating circumstances. He notes that the jury was not provided with a special verdict form on which to designate mitigation, only a form that listed aggravators but no mitigators. Thus, according to him, it was impossible for the Supreme Court of Nevada to conclude that the jury found no mitigating circumstances. He contends that the court's categorical exclusion of mitigating evidence contravened *Clemons* and its progeny, which require the appellate court to consider mitigation evidence in its reweighing analysis. He further points out that the Supreme Court of Nevada had previously found, on direct appeal, that Mulder had presented "compelling" mitigation evidence.

The respondents concede that, because it did not specifically address any of the mitigation evidence, the Supreme Court of Nevada did not conduct a proper reweighing analysis. *See* ECF No. 246 at 14–15 (citing *Clemons*, 494 U.S. at 752). They argue, however, that the court properly conducted the alternative to reweighing condoned by *Clemons*—i.e., harmless error review. The respondents note that the court specifically addressed the evidence that supported the remaining aggravators and why the stricken aggravators did not impact the jury's verdict. They further note that all the facts underlying the stricken aggravators were developed during the guilt

phase, so the jury was privy to them, and that the prosecutor emphasized Mulder's prior felony convictions—i.e., the valid aggravators—in his closing argument.

I find the respondents' argument unconvincing for a few reasons. First, the Supreme Court of Nevada specifically indicated that it was "reweighing the remaining aggravating and mitigating circumstances." ECF No. 137-22 at 8. I recognize that state courts are not held to "a particular formulaic indication ... before their review for harmless error will pass federal scrutiny" and that the Supreme Court of Nevada's declaration that the error in Mulder's case was "harmless beyond a reasonable doubt" suggests that the court conducted the required harmless error analysis. *See Sochor*, 504 U.S. at 540. However, I read the state court's opinion here as making that determination only with respect to the jury's ultimate decision to sentence Mulder to death, not to the threshold decision as to whether he was eligible for the death penalty in the first place. *See Jeremias v. State*, 412 P.3d 43 (Nev. 2018) (noting that, under Nevada law, "the jury may *not* impose a death sentence if the mitigating circumstances outweigh the aggravating circumstances" (emphasis in the original)).

Second, regardless of whether the state appellate court is reweighing or conducting harmless error review, the individualized sentencing required by the Constitution necessarily includes the consideration of mitigating evidence. *See Parker v. Dugger*, 498 U.S. 308, 322 (1991). In vacating the judgment in *Clemons*, the Court held that "because the Mississippi Supreme Court's opinion is virtually silent with respect to the particulars of the allegedly mitigating evidence presented by Clemons to the jury, we cannot be sure that the court fully heeded our cases emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence." *Clemons*, 494 U.S. at 752. Here, the Supreme Court of Nevada was not only silent with respect to mitigation evidence Mulder presented in the penalty phase, but it also strongly suggested that it did not consider mitigation evidence in its review of Mulder's death sentence because the jury had not found any mitigating circumstances.

Finally, the respondents are correct that, even if the robbery and burglary aggravators were invalid, the jury was nonetheless made aware of the circumstances supporting those aggravators by the State's guilt phase case. However, under Nevada law, the jury was not permitted to consider the evidence relevant to the stricken aggravators until after it had determined that Mulder was eligible for the death penalty. *See Rippo*, 122 Nev. at 1093 ("The consideration of invalid factors before that point skews the eligibility decision, even if those factors would be relevant in deciding subsequently whether a death-eligible defendant actually should receive a death sentence."). Thus, the Supreme Court of Nevada could not rely on the jurors' exposure to that evidence to conclude beyond a reasonable doubt that the jurors would have found that the mitigating circumstances did not outweigh the aggravating circumstances.

Based on the foregoing, I conclude the Supreme Court of Nevada did not conduct a "careful appellate weighing of aggravating against mitigating circumstances" after disregarding the invalid aggravating circumstances. *Clemons*, 494 U.S. at 748. I further conclude that, while the state court may have reviewed for harmless error the jury's decision to sentence Mulder to death after finding him eligible for the death penalty, the court did not conduct such a review of the jury's eligibility decision. In sum, based on the record before the court, the Supreme Court of Nevada's appellate review of Mulder's death sentence did not comply with *Clemons* and its progeny and, as a result, violated his rights under the Eighth Amendment.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) allows a federal court to "disturb a final state-court conviction in only narrow circumstances." *Brown v. Davenport*, 596 U.S. 118, 125 (2022). Among the statute's limitations is a provision that, "when a state court has already ruled on the merits of the habeas petitioner's claim, he must show that decision was either (1) 'contrary to' or an 'unreasonable application of' clearly established federal law, as determined by the decisions of [the Supreme Court], or (2) based on an 'unreasonable determination of the facts' presented in the state-court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)). Because the Supreme Court of Nevada's decision to affirm Mulder's death sentence after

11

invalidating two aggravating facts was contrary to Supreme Court precedent, section 2254(d) does not prevent me from granting Mulder habeas relief. However, in addition to the AEDPA test, I must also apply the test the Supreme Court outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Id.* at 122.

Under *Brecht*, I must "determine whether the Eighth Amendment error had a substantial and injurious effect or influence on the jury's verdict." *Beardslee v. Brown*, 393 F.3d 1032, 1041 (9th Cir. 2004) (quotation and citation omitted). A habeas petitioner must establish that the error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). However, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

Removing the robbery and burglary aggravators from consideration, the two valid aggravators supporting Mulder's death sentence that remain are the two prior violent felony convictions, one for a bank robbery in Arizona in 1987 and one for an armed robbery in Arizona in 1980. ECF No. 137-22 at 5-6. In support of the 1987 bank robbery conviction, the State presented the testimony of Judy Siebert, the bank teller who was robbed on October 20, 1986. ECF No. 131-16 at 13–16. According to Siebert's testimony, a man approached her counter on that date, instructed her to not look at him, said he had a gun, and demanded "a stack of 50s and a stack of 100s." *Id.* at 15. She testified that she was scared because she did not have any 100s, but that she gave him a stack 50s, which the man took and immediately left. *Id.* Siebert was not able to identify Mulder, but an Arizona police officer testified that on December 15, 1986, Mulder turned himself in for the bank robbery. ECF No. 131-19 at 35. Mulder was sentenced to serve seven years in federal prison. *Id* at 36.

In support of the 1980-armed robbery conviction, the State presented the testimony of former Phoenix police detective, Cliff Shugart. ECF No. 131-19 at 23–33. Detective Shugart testified that on March 15, 1980, Mulder robbed a sixteen-year-old cashier at a Taco Bell. *Id.* at 25–27.

According to a police report, Mulder approached the cashier, pointed a small black revolver at her, threw down a paper bag, and said, "give me all your money" and "hurry up." *Id.* at 27. After the cashier gave him all the money in the cash register, Mulder ran out the door. *Id.* Detective Shugart further testified that, on April 21, 1980, Mulder robbed an employee of Church's Chicken. *Id.* at 27–30. According to the police report for that incident, Mulder entered the business carrying a paper bag under his left arm, pulled a gun from his waistband, and told the employee that he wanted all her money. *Id.* at 28–29. Mulder removed all the bills from the cash register tray and fled. *Id.* After entering a plea bargain dismissing one of the charges, he pled guilty to armed robbery and was sentenced to seven years in the Arizona State Prison. *Id.* at 32–33.

As mitigating evidence, Mulder presented the testimony of a psychologist, Van Heusen, and a priest. The psychologist, Louis Mortillaro, testified that he conducted psychological tests on Mulder in his office and saw him three additional times at the Clark County Detention Center. ECF No. 131-20 at 34–35. Based on "validity scales" included within the psychological testing and his professional experience, Mortillaro opined that Mulder was truthful with him and did not exaggerate his symptoms. *Id.* at 37–38. In his testimony, Mortillaro related the following. Growing up, Mulder had what Mortillaro considered a "a very dysfunctional family relationship," with a lack of guidance, structure, and supervision. *Id.* at 39. To compensate for his poor self-esteem and fragile self-concept, Mulder turned to drug use at an early age. *Id.* at 39–40. He used heroin two or three times a day if he had the money and was able to get it. *Id.* at 40. He also used methamphetamine, which together with heroin, impaired his judgment and caused him to act inappropriately. *Id.* at 40–41. Mulder's crimes, which included bank robbery, armed robbery, and forgery, were to get money "to fuel the out-of-control drug habit and the dysfunctional asocial behavior." *Id.* at 42. Mortillaro diagnosed Mulder with impulse control disorder.

Van Heusen testified that she was a prostitute and drug abuser when she met Mulder while living in a home for recovering addicts in Riverside, California. ECF No. 132-21 at 18–19. She related that, although Mulder had quit using drugs and had a job, they started using

13

methamphetamine every day when they could get it. *Id.* at 20–21. She testified that Mulder was never violent and that, despite not wanting to be in a relationship, she fell in love with him. *Id.* at 22–24. According to her testimony, they moved to Las Vegas thinking it would give them a fresh start but that it did not turn out as they expected. *Id.* at 24–25. They lived in a series of cheap motels with Van Heusen working as a prostitute to get money for drugs. *Id.* at 26–28. A couple of months before the murder, Van Heusen conceived a child with Mulder, which she did not think was possible because she and her husband had unsuccessfully tried to have a baby for a long time. *Id.* at 28. She and Mulder talked often about getting out of Las Vegas and quitting drugs so they could have a good life with their baby. *Id.* at 29. She explained that, at the time of the murder, it was "a horrible, desperate time in both of our lives" and that Mulder was a good person who wanted to do the right thing, but that drugs make "you get so desperate and … so irrational" that "[y]ou do things you would never do." *Id.* at 30.

The priest, Charles Kiefer, testified that, while he was working as a vocation director for a diocese in Phoenix in 1989, he received a letter from Mulder, then finishing his term in federal prison, inquiring about becoming a priest. ECF No. 131-21 at 36. He visited Mulder in prison and learned that he was in recovery from drug addiction and wanted to help other people. *Id.* at 39–43. Father Kiefer testified that Mulder had "a gentleness and sensitivity" that he had learned to keep below the surface "for his own survival." *Id.* at 43. When asked whether Mulder's having been convicted of murder changed his feelings about him, he explained that, based on his own experience dealing with addicts over the years, he knew that people under the influence of drugs "can make some hideous decisions in their life," but he still saw "goodness and gentleness … present with Michael." *Id.* at 44. He also testified about Mulder helping a young man in county jail on the road to recovery from addiction and about Mulder later sponsoring about 125 recovering addicts in California. *Id.* at 46–47.

14

Having reviewed all the mitigating evidence, I am in grave doubt about whether the invalid aggravating circumstances had a substantial and injurious effect in determining the jury's verdict. Without question, the murder in this case was incredibly brutal. And, it is very likely that at least some of the jurors relied on the nature of the crime to find that mitigating circumstances did not outweigh the aggravating circumstances. However, with the burglary and robbery aggravators invalidated, the jury would not be permitted to consider the circumstances of the murder itself until it had decided that Mulder was *eligible* for the death penalty. *See Rippo*, 146 P.3d at 284. That being the case, I am unable to determine with fair assurance that no juror would have found that the mitigating evidence discussed above outweighed the remaining aggravators—i.e., the 1987 bank robbery in Arizona and the 1980 armed robberies. Thus, I must conclude that Mulder's rights "were substantially and injuriously affected," which means Mulder is entitled to habeas relief. *See Hurd v. Terhune*, 619 F.3d 1080, 1090 (9th Cir. 2010) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). So I order the State of Nevada to either provide him a new penalty-phase trial or vacate the death sentence and impose a lesser sentence consistent with the law.

## B. Claim Six—Premeditation Instruction

In Claim Six, Mulder alleges that his constitutional rights were violated when the Supreme Court of Nevada concluded that the trial court's use of an unconstitutional jury instruction was harmless error. The jury instruction at issue is commonly referred to by the name of the Supreme Court of Nevada case in which it was first discussed, *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992). The *Kazalyn* instruction given in the guilt phase of Mulder's trial stated:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

ECF No. 131-15 at 10.

At the time of Mulder's trial, the Supreme Court of Nevada had held that "deliberate, premeditated and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death to result." *Powell v. State*, 838 P.2d 921, 927 (1992). However, just over a month after it affirmed Mulder's conviction on direct appeal, but before it issued its remittitur, the Supreme Court of Nevada held that *Powell* had "confus[ed] … premeditation and deliberation," and "underemphasized the element of deliberation." *Byford v. State*, 994 P.2d 700, 713 (Nev. 2000). The court in *Byford* directed the state district court to instruct juries that "[d]eliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action." *Id.* at 714.

In his first state habeas appeal, Mulder argued that *Byford* must be applied retroactively and that he was entitled to a new trial at which the jury would be given the new definition of deliberation. ECF No. 137-14 at 19–34. The Supreme Court of Nevada ruled that the claim was procedurally barred because Mulder did not raise it on direct appeal. ECF No. 137-22 at 22. The court agreed that Mulder could demonstrate cause to overcome the default because *Byford* was issued before Mulder's direct appeal was final, but the court determined that the failure to instruct the jury in accordance with *Byford* was not prejudicial because there was "ample evidence to establish that [Mulder] committed both premeditated and deliberate murder as well as felony murder." *Id.* at 22-24.

The respondents acknowledge that the use of the *Kazalyn* instruction in Mulder's case was erroneous because *Byford* was issued before his conviction became final. ECF No. 246 at 25. The dispute here centers on whether the error was harmless under *Brecht*. If the reviewing court is "left 'in grave doubt' about whether the jury would have found deliberation on [the petitioner's] part if it had been properly instructed," the error was not harmless. *Polk v. Sandoval*, 503 F.3d 903, 913 (9th Cir. 2007).

16

Mulder argues that the evidence supporting deliberation was not strong in his case. He points to Van Heusen's testimony that he looked surprised when she informed him that Ahart had died and that he told her that Ahart's injuries were not as bad as Van Heusen's mother had described them to Van Heusen. ECF No. 225 at 42 (citing ECF No. 131-13 at 39). Mulder also cites two Ninth Circuit cases—*Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007) and *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2008)—in which he claims the court found *Brecht* error despite far stronger deliberation evidence than was presented in this case. In *Polk*, the court held that use of the *Kazalyn* instruction was not harmless error despite evidence that "(1) Polk had threatened and fought with [the victim] about two months before the murder, (2) there was a loud argument at the scene of the murder shortly before gunshots were heard; and (3) Polk borrowed a bulletproof vest on the evening of the murder, which witnesses testified that he wore." *Polk*, 503 F.3d at 912–13. In *Chambers*, the court arrived at the same conclusion despite evidence that Chambers stabbed his victim seventeen times; that the wounds penetrated three inches into the body and were located in two separate clusters of wounds; and that Chambers was not mentally disturbed, but at the most merely drunk. *Chambers*, 549 F.3d at 1200–01.

Mulder's arguments are not convincing. The circumstances surrounding the murder, as recounted by the Supreme Court of Nevada in the excerpt above, are not in dispute. That account, along with other evidence presented at Mulder's trial, demonstrate that the murder in this case was a calculated act. In *Polk* and *Chambers*, the evidence supported a finding that the defendant was involved in a rage-filled argument with the victim that escalated to a murder committed in the heat of the moment. *See Polk*, 503 F.3d at 912; *Chambers*, 549 F.3d at 1201.

Here, by contrast, Mulder hogtied a 77-year-old man with duct tape and bashed his head in with a blunt object. There is little question that Mulder acted deliberately. And, any argument that Mulder did not intend to kill Ahart is belied by the sheer force of the blows he imparted and the damage done to Ahart's head. The coroner who performed the autopsy on Ahart testified that it required somewhere between 200 and 400 pounds per square inch of force to inflict the types of

17

injuries Ahart sustained. ECF No. 131-5 at 35. In addition to the details recounted by the Supreme Court of Nevada, the coroner testified that the 15-inch hinge fracture was a non-survivable injury and an individual receiving the injuries he described would not survive more than a few minutes. *Id*. at 32, 35. As for Mulder's expressing surprise that Ahart had died and minimizing the extent of Ahart's injuries, the comments were made when Van Heusen confronted him about killing the "old man." ECF No. 131-8 at 50–52. In all likelihood, Mulder was attempting to downplay what he had done. *Id*. Given the evidence discussed above, it is extremely doubtful that Mulder was not aware that he had killed Ahart.

Mulder also analogizes his case to *Riley v. McDaniel*, another case in which the court concluded that use of the *Kazalyn* instruction was not harmless error under *Brecht*. These were the circumstances of the murder in *Riley*:

> Riley and his girlfriend, Kim Johnson, were guests at the home of Leotis Gordon, where Bollin, a drug dealer, was living. Darrell Lee Jackson—the only eyewitness to the murder—testified as follows: Riley, Bollin, and Jackson were together in a bedroom-lounge when Riley became "emotional and angry about the treatment he had received from drug dealers," and suggested that he would "start robbing drug dealers who did not treat him appropriately." Jackson and Bollin gave some cocaine to Riley, who smoked it as Bollin took a shower. After Bollin finished his shower, the three men moved to Bollin's room. Riley told Bollin that his cocaine was "mine now," and Bollin replied, "you're going to have to kill me first"; Riley then asked Bollin whether he was "ready to die," and Bollin requested permission to "finish taking this hit." After Bollin put down the pipe, he told Riley that he was ready to die, and Riley shot him in the chest with a shotgun.

*Riley*, 786 F.3d 719, 722 (9th Cir. 2015).

As it did in *Riley*, the State argues in this case that any instructional error regarding deliberation is harmless because the jury could have convicted Mulder under the felony-murder rule. *See* ECF No. 246 at 31; *Riley*, 786 F.3d at 726. In rejecting that argument, the court in *Riley* noted that "the relevant question is not simply whether we can be reasonably certain that the jury *could* have convicted [Riley] based on the valid theory of felony murder, but whether we can be reasonably certain … that the jury *did* convict [him] based on the valid felony murder theory." *Id*. (citation and internal quotation marks omitted) (emphasis in the original). In this case, as in *Riley*,

18

the jury was not asked to specify whether it found first-degree murder based on a felony-murder theory rather than willful, deliberate, and premeditated murder. The *Riley* court observed that "[a] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Riley*, 786 F.3d at 726 (quoting *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (internal quotation marks omitted)).

The court then distinguished Riley's case from *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), a case in which it had concluded that it "could 'discern with reasonable probability' that the jury had in fact convicted Babb based on a felony murder theory despite the absence of a special verdict because 'during closing argument, the prosecutor focused almost exclusively on the felony murder theory,' and, more important, because 'the jury was specifically instructed to only consider premeditated murder if felony murder did not apply.'" *Id*. at 727 (quoting *Babb*, 719 F.3d at 1034). The court held that, unlike in *Babb*, it had "no reason to believe that the jury in fact decided to convict Riley based on a felony-murder theory rather than on the more traditional first-degree murder charge," because "the prosecutor relied heavily on the premeditated murder theory and instruction, and the jury was not told to consider the alternate theories in a particular order." *Id*. The court determined that, under those circumstances, the facts of Riley's case warranted a finding that the error was not harmless:

> Riley clearly acted wilfully—he intended to kill Bollin—and with premeditation—he formed that intent prior to shooting him. However, the evidence of Riley's cocaine intoxication and emotional agitation might well have created reasonable doubt as to the third element of first-degree murder, the one the court's instructions failed to identify as an independent element: deliberation. Because the prosecutor relied on that failure in his closing argument, repeatedly returning to the language of the instruction itself in arguing the premeditated murder theory, and because the general verdict of guilt does not allow us to determine that the jury based its conviction on a different theory, the error was not harmless. As we are in "grave doubt," we conclude that Riley was prejudiced.

*Id*.

In its closing arguments in this case, the prosecution briefly discussed both the standard for premeditated murder and the felony-murder rule, but, unlike the prosecution in *Babb* and *Riley*, did not emphasize one theory more than the other. ECF No. 131-13 at 2–25, 32–56. Instead, the prosecutor told jurors that it could rely on either theory and that the entire jury did not need to agree on one theory to convict Mulder of first-degree murder. *Id.* at 7. Even though the prosecution did not focus on the premeditation theory like the prosecution in *Riley*, I cannot be reasonably certain, like the court in *Babb*, that the jury did convict Mulder based on the valid felony murder theory and cannot, on that basis alone, conclude that the premeditation instruction did not have a substantial impact on the jury's decision.

Even in light of the holding in *Riley*, however, I am not left in grave doubt about whether the jury would have found deliberation on Mulder's part if it had been properly instructed. Like *Polk* and *Chambers*, *Riley* is readily distinguishable from this case. There is no evidence that Mulder was under the influence of drugs at the time of the murder or emotionally "very upset" like Riley. *See Riley*, 786 F.3d at 725. And, rather than kill his victim with a single gunshot, Mulder subdued his victim, bound his feet and legs with duct tape, and then struck him in the head numerous times with extreme force. Clearly, Mulder had the opportunity to "engage[] in a 'dispassionate weighing process and consideration of consequences before acting.'" *Id.* (quoting *Byford*, 994 P.2d at 714). Having concluded that Mulder's rights were not substantially and injuriously affected by the trial court's use of the *Kazalyn* instruction, I deny Claim Six of Mulder's habeas petition.[4]

C.  **Claim Twelve—Ineffective Assistance of Appellate Counsel (*Kazalyn* Instruction)**

In Claim Twelve, Mulder alleges he was deprived of effective assistance of appellate counsel because his counsel on appeal failed to raise the claims he raised throughout his second

---

[4] The respondents also argue that Mulder is estopped from arguing that the use of the *Kazalyn* instruction was not harmless error because, in order to prevail in state court on his *McConnell* claim, he had to concede that the jury could have relied on the felony-murder rule to find him guilty of first-degree murder. I see some merit to this argument. *See United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999) ("The purpose of judicial estoppel is to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." (internal quotations marks and citation omitted)). However, having concluded that use of the *Kazalyn* instruction was harmless error in any case, I decline to decide whether judicial estoppel applies here.

amended petition. The court previously concluded that the claim was procedurally defaulted except for a claim that counsel on appeal was ineffective by not challenging the trial court's use of the *Kazalyn* instruction. ECF No. 206. Thus, the only portion of Claim Twelve that remains for consideration on the merits is Mulder's claim that he was not provided effective assistance of counsel because his counsel on appeal did not argue that the trial court erred in his case by not raising the *Kazalyn* issue.

A claim of ineffective assistance of counsel is cognizable as a claim for denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). For relief to be granted under *Strickland*, a petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and, (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687–88; *see also Bell v. Cone*, 535 U.S. 685, 695 (2002); *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). The right to effective assistance of counsel applies to the performance of both trial and appellate counsel. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

In his first state habeas proceeding, the Supreme Court of Nevada rejected Mulder's claim that his counsel on direct appeal was ineffective by not making a *Kazalyn* argument:

> We further conclude that Mulder failed to demonstrate that his trial and appellate counsel were ineffective. First, because Kazalyn was the accepted instruction at the time of Mulder's trial, we conclude that trial counsel were not deficient for failing to object to the instruction. Second, because sufficient evidence supports Mulder's conviction for premeditated, deliberate, and willful murder, Mulder failed to demonstrate that he was prejudiced by any purported failure on the part of his trial counsel. Likewise, we conclude that he was not prejudiced by his appellate counsel's failure to raise this issue on direct appeal. Strickland v. Washington, 466 U.S. 668, 694; Kirksey v. State, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996). To the extent Mulder complains that the district court failed to consider his claims of ineffective assistance of trial and appellate counsel below, we disagree. We have reviewed the record and conclude that the district court determined that Mulder failed to demonstrate prejudice as to all of his ineffective assistance of counsel claims and was, therefore, not entitled to an evidentiary hearing on those matters.

ECF No. 137-22 at 24 n.8. Because the state court adjudicated the claim on the merits, I cannot grant Mulder relief unless the state court's decision satisfies one of the requirements set forth in 2254(d).

Although the Supreme Court of Nevada cited the correct federal law standard—i.e., *Strickland*, Mulder argues that its decision was contrary to clearly established federal law because, had it found the *Kazalyn* instruction erroneous on direct appeal, it could only affirm Mulder's conviction if it found the error harmless beyond a reasonable doubt, a standard not satisfied by a mere finding that there was sufficient evidence to support the conviction. Mulder is correct that, when an instructional error omitting an element of a crime deprives a defendant of due process, "the court may sustain the conviction only if it can satisfy itself that the error is harmless." *Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003) (citing *Neder v. United States*, 527 U.S. 1, 8–11 (1999). However, the Supreme Court of Nevada in *Byford,* and in a decision it issued a few months later—*Garner v. State*, 6 P.3d 1013 (Nev. 2000)— did not consider giving the *Kazalyn* instruction to be constitutional error. *See Garner*, 6 P.3d at 1025. Indeed, the court in *Byford* upheld his conviction based on a finding that evidence in his case was "clearly sufficient to establish deliberation and premeditation on Byford's part." *Byford v. State*, 994 P.2d at 712. Only several years later did the court "acknowledge that the change effected by *Byford* properly applied to that case as a matter of due process." *Nika v. State*, 198 P.3d 839, 850 (Nev. 2008).

In finding lack of *Strickland* prejudice with respect to Mulder's ineffective assistance of appellate counsel claim, the Supreme Court of Nevada applied the sufficient evidence standard that it would have presumably applied had direct appeal counsel raised and prevailed on the *Kazayln* issue that subsequently carried the day in *Byford*. *Strickland* prejudice is generally assessed in light of the state of the law at the time the claim of ineffective assistance is made, not at the time of counsel's performance. *See Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993). So, having decided *Nika* a few months earlier, the Supreme Court of Nevada arguably erred by not assessing Mulder's likelihood of succeeding on appeal based on the harmless error standard rather than the sufficient

evidence standard. However, even assuming the Supreme Court of Nevada's decision is contrary to federal law, Mulder's ineffective assistance of appellate counsel claim fails under de novo review.

Unlike the prejudice prong, evaluation of performance under *Strickland* is limited to a contemporaneous assessment, i.e., viewing the facts as of the time of counsel's conduct without the benefit of hindsight. *Strickland*, 466 U.S. at 690; *see also Fretwell*, 506 U.S. at 372. The *Kazalyn* instruction represented a correct statement of the law at the time Mulder's direct appeal was being briefed. *See Nika*, 198 P.3d at 851. "[C]ourts have articulated a rule that ineffective assistance of counsel claims generally cannot be predicated on counsel's failure to anticipate changes in the law." *United States v. Juliano*, 12 F.4th 937, 940 (9th Cir. 2021) (citing several cases from other circuits).

Mulder argues that appellate counsel should have filed a petition for rehearing after the decision in *Byford* was issued, but counsel had already filed one petition for rehearing prior to the *Byford* decision. ECF No. 133-11. Given the Supreme Court of Nevada's decision to affirm Byford's conviction notwithstanding the trial court's use of the *Kazalyn* instruction, Mulder's appellate counsel cannot be faulted for not filing yet another petition for rehearing while simultaneously petitioning the United States Supreme Court for certiorari. ECF Nos. 133-44, 133-45. Moreover, by the time Mulder's petition for a writ of certiorari was denied, the Supreme Court of Nevada had ruled in *Garner* that the *Byford* holding did not retroactively apply to convictions like Mulder's that had yet to become final. *Garner*, 6 P.3d at 1025. In short, Mulder cannot demonstrate that his appellate counsel's performance fell below an objective standard of reasonableness under the circumstances present at the time his direct appeal was pending. Thus, I deny Claim Twelve.

**D.  Procedurally Defaulted Ineffective Assistance of Counsel Claims**

Mulder's remaining claims are procedurally defaulted ineffective assistance of trial counsel (IATC) claims for which he argues the default should be excused under the holding in *Martinez*. Under *Martinez*, a habeas petitioner can demonstrate cause to overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had

no counsel during the state postconviction proceedings or (b) such counsel was ineffective under the standards of *Strickland*. *Martinez*, 566 U.S. at 14. He must also demonstrate that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. *Id.* A claim is "substantial" for purposes of *Martinez* if it has "some merit," which is analogous to the standard for issuing a certificate of appealability. *Id.* at 14. This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See, generally, Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003). However, "[b]ecause *Martinez* requires a showing that post-conviction counsel was ineffective under the standards of *Strickland*, a petitioner who was represented by post-conviction counsel in his initial-review collateral proceeding must show not only that his procedurally defaulted trial-level IAC claim is substantial but also that there is a reasonable probability that the trial-level IAC claim would have succeeded had it been raised' by post-conviction counsel." *Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019) (internal quotation and citation omitted). Having considered Mulder's procedurally defaulted IATC claims under the *Martinez* standard, I conclude for the reasons that follow that Mulder has not established that the default of any of these claims should be excused.

*Claim Three* – In Claim Three, Mulder alleges he was deprived of effective assistance of trial counsel due to counsel's failure to prepare for his trial. In a previous order, this court dismissed some of the sub-claims in Claim Three as untimely. ECF No. 206. The court determined that the remaining sub-claims— Claims Three(B), Three(D), Three(E), and Three(F)(2)—were timely, but procedurally defaulted. *Id.* Mulder makes a *Martinez* argument with respect to each of those sub-claims.

In Claim Three(B), Mulder alleges that institutional impediments within in the office of the Clark County Special Public Defender prevented it from providing effective assistance of counsel in his case. In Claim Three(D), he alleges that his lawyers were ineffective by failing to investigate and present compelling mitigating evidence that was readily available. In Claim 3(E), he alleges that counsel were ineffective for failing to adequately investigate and present evidence of

24

a history of addiction in his family and evidence related to his own addiction. In Claim Three(F), he alleges that his lawyers were ineffective for failing to rebut the State's arguments concerning future dangerousness by presenting testimony from an institutionalization expert.

To support these claims, Mulder has submitted a wide variety of evidence including numerous declarations, records from schools and public agencies, and pleadings and transcripts from other Nevada capital cases.[5] The problem for Mulder is that hardly any of this evidence was presented to the state court prior to filing his procedurally-barred second state post-conviction petition. As explained in my order denying Mulder's motion for an evidentiary hearing, I am not permitted to consider such evidence in deciding whether Mulder can meet the *Martinez* standard. ECF No. 251. Without the evidence, Mulder cannot establish a reasonable probability that the state court would have granted relief had counsel raised the procedurally defaulted sub-claims in Claim Three in his initial post-conviction proceeding. Thus, the default of those claims is not excused under *Martinez*.

*Claim Five* – In Claim Five, Mulder alleges that his death sentence is invalid under various constitutional guarantees "because the general verdict form that was given to the jury directed them to find that the mitigation evidence was outweighed by the statutory aggravating circumstances, because the jury was not given a verdict form in which to find that mitigation outweighed aggravation, and because the verdict form did not permit the jury to find the presence of, and to designate the weight to be given to, the mitigating factors found by individual jurors." ECF No. 165 at 145. Embedded in Claim 5, which is procedurally defaulted, is a claim that trial counsel "were ineffective in failing to ensure that the penalty jury received a verdict form that would allow them to find that mitigation outweighed statutory aggravating circumstances." *Id.* at 149.

---

[5] Citations to this evidence can be found in the relevant portions of Mulder's second amended petition. *See* ECF No. 165 at 54-69, 73-124.

25

The state court record includes two verdict forms. One, a special verdict form, lists the four aggravating circumstances alleged by the State and indicates that the jury found that each had been established beyond a reasonable doubt. ECF No. 132. The other form, which reflects the jury's death verdict, contains the following language followed by the four possible punishments for the jury to choose:

> We, the Jury in the above entitled case, having found the Defendant, MICHAEL JOSEPH MULDER, Guilty of COUNT 1 – MURDER OF THE FIRST DEGREE and having found that the aggravating circumstance or circumstances outweigh any mitigating circumstance or circumstances impose a sentence of,

ECF No. 132-1.

Mulder contends that these forms violated his constitutional rights because they directed the jury to find that statutory aggravating circumstances outweighed mitigating circumstances and did not allow the jury to make the opposite finding. According to Mulder, the verdict form essentially directed the jury to find him eligible for the death penalty. Mulder also notes that the jury was given a special verdict form on which to designate each of the aggravating circumstances that they found but not a special verdict form for individual jurors to find the existence of any mitigating circumstances.

I agree that, if the verdict forms described above were the only forms provided to the jury, Mulder's trial counsel's failure to object to them arguably fell below the *Strickland* performance standard. However, I am not convinced that is the case. Included among the instructions given to the jury is the following:

> The Court has submitted two sets of verdicts to you. One set of verdicts reflects the three possible punishments which may be imposed. The other verdict is a special verdict. They are to reflect your findings with respect to the presence or absence and weight to be given any aggravating circumstances and any mitigating circumstances.

ECF No. 131-26 at 20. While Mulder argues that this instruction supports his position, I read the instruction differently. The use of the word "set" suggests that the jury was provided a separate

verdict form for each of the possible punishments.[6] Understandably, the forms reflecting the punishments the jury did not choose would not necessarily be included in the state court record, only the forms signed by the foreperson and filed with the trial court. The verdict form indicating the jury's decision to sentence Mulder to death correctly provided the jury with the other three punishment options notwithstanding the jury's finding that aggravating circumstances outweighed the mitigating circumstances.

In addition, the jury instructions clearly informed jurors of the statutory process for deciding whether to sentence Mulder to death or to a lesser punishment. The trial court instructed the jurors that in order to sentence Mulder to death, they: (1) must unanimously agree on aggravators, (2) individually consider and weigh the mitigating factors, (3) individually determine if the mitigating circumstances outweigh the aggravating circumstances, and (4) unanimously decide to impose death. ECF No. 131-26 at 8, 9, 13. The jury was further instructed that it was not required to impose death "under any circumstances," even if the aggravating circumstances outweighed the mitigating circumstances, and that Mulder did not have to establish mitigating circumstances to avoid the death penalty. *Id*. at 9. Another instruction explained what constitutes a mitigating circumstance and how mitigating circumstances were to be balanced against aggravating circumstances. *Id*. at 10. The jury was also provided the list of mitigating circumstances to be considered, including the catch-all "[a]ny other mitigating circumstances." *Id*. at 12.

In summary, I find that Mulder was not deprived of effective assistance of counsel due to his trial counsel's failure to object the verdict forms because Mulder has not established the verdict forms reflecting the penalty phase verdict in this case were the only forms provided to the jury and because the jury instructions undermine any claim that the jury was improperly compelled to find

[6] In 1995, the Nevada legislature amended the statute governing the possible punishments for first-degree murder to add a definite term of 50 years as a fourth possible punishment. *See* 1995 Statutes of Nevada, Page 1181-31 (Chapter 443, SB 416) (amending NRS 200.030). Although the jury in Mulder's case was instructed to consider this additional possible punishment (see ECF No. 131-26 at 5), I suspect that this particular instruction noting *three* possible punishments had not been updated to the reflect the 1995 amendment.

Mulder eligible for the death sentence. Finally, Mulder cites to no legal authority requiring the trial court provide forms for the jury to indicate its findings with respect to mitigating circumstances. And, with the jury provided the instructions discussed above, defense counsel did not perform deficiently by failing to insist upon one. Thus, I conclude that there is not a reasonable probability that the state court would have granted relief had Mulder's counsel raised the IATC claim in Claim Five in his initial post-conviction proceeding. So the default of the claim is not excused under *Martinez*.

*Claim Eight* – In Claim Eight, Mulder alleges that his conviction and death sentence are invalid under various constitutional guarantees "due to trial counsel's failure to perform effectively during voir dire, due to the trial court's improper effort to hurry the voir dire proceedings and its improper removal of a qualified juror for cause." ECF No. 165 at 170. This claim is also procedurally defaulted, but Mulder makes a *Martinez* argument with respect to the portion challenging trial counsel's performance. Mulder contends that his trial counsel were ineffective during voir dire because they: (1) unreasonably failed to life qualify the jury and allowed the trial court to conduct the brief and perfunctory voir dire, (2) asked potential jurors whether they could consider all forms of punishment "equally" if they convicted him of first-degree murder, (3) failed to remove biased jurors for cause, and (4) failed to object when the trial court removed a juror because she expressed reservations about the death penalty.

As to the first item, "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors," and, upon request, the trial court must allow inquiry into whether a potential juror would automatically impose the death penalty upon the defendant's conviction. *Morgan v. Illinois*, 504 U.S. 719, 729–733 (1992). However, the Sixth Circuit has recognized that "*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case," only that "a defendant has the right to life-qualify his jury upon request." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001). The court in *Stanford* held that "failure to life-qualify a jury is not per se ineffective assistance of counsel" and identified strategic reasons for

foregoing life-qualifying questions, including: (1) not wanting "individual jurors to hear one another's answers to life-qualifying questions," (2) being already "satisfied with the composition of the jury and confident in its ability to honestly and ably perform its duties," and (3) having "calculated that asking additional life-qualifying questions might aid the *prosecution* in deciding how to use its peremptory challenges." *Id.* (emphasis in original). In another case addressing a claim alleging IAC due to counsel's failure to life qualify a jury, the Eleventh Circuit has observed that "it seems reasonable for trial counsel to want to focus the jury on the idea of the death penalty as little as possible." *Brown v. Jones*, 255 F.3d 1273, 1279 (11th Cir. 2001).

Mulder has not established that his counsel did not have a valid strategic reason for not asking potential jurors life qualifying questions. In addition, he has not demonstrated a reasonable probability that counsel's failure to adequately life qualify the jury or demand a more extensive voir dire resulted in the seating of an impartial juror or changed the outcome of the penalty phase of his trial. Similarly, Mulder has also not demonstrated that trial counsel asking potential jurors whether they could consider the penalty alternatives "equally" resulted in *Strickland*-level prejudice.

As for the allegedly biased jurors, Mulder identifies Lillie Lairson and William Irwin as two jurors effective counsel would have challenged for cause. With respect to Lairson, he points to her juror questionnaire on which she indicated that she had twice been a victim of child molestation and that any crime against the elderly should be "punished to the max." ECF No. 16-5 at 12–13. In response to a question asking whether a defendant charged with a crime should have to prove his innocence, she marked both "yes" and "no," explaining that, "if a defendant has a solid case against him, then I think they better get on the hoof and prove the allegations wrong." *Id.* at 18.

While these responses may have been cause for concern for the defense, I doubt they provided grounds for a successful challenge for cause when viewed in the context of the rest of Lairson's questionnaire responses and her responses to questioning on voir dire. To begin with, Lairson was fifty years-old when she served on Mulder's jury. *Id.* at 6. Her being the victim of child molestation roughly 40 years in the past would have had little impact on her ability to serve as an

impartial juror in a case that did not involve a similar crime. On the issue of a defendant having to prove his innocence, her response was equivocal and, in response to a question asking her opinion about whether a defendant at a criminal trial should be required to prove his or her innocence, she marked "disagree." *Id.* at 26. Also, when asked about it during voir dire, she confirmed that she understood that requiring a defendant to prove his innocence is not the correct standard. ECF No. 130-3 at 31. As to punishing crimes against the elderly, Lairson testified that, even though the victim in Mulder's case was elderly, Mulder's punishment if convicted would "depend on the circumstances" and that she would consider all the available forms of punishment. *Id.* at 31–32. She also indicated on her juror questionnaire that consideration of mitigating circumstances was important and that someone convicted of first-degree murder should never be sentenced to death without consideration of background information. ECF No. 16-5 at 23. Thus, the state court record does not establish a reasonable probability that a challenge for cause would have been successful or that defense counsel did not have a valid strategic reason for not attempting to remove Lairson.[7]

For Irwin, Mulder claims that Irwin stated during voir dire questioning that he would always vote for the death penalty. This claim relies on strained reading of the voir dire transcript. Apparently, Irwin provided conflicting responses on his juror questionnaire by indicating that, upon finding a defendant guilty of first-degree murder, he would always vote for the death penalty and would never vote for the death penalty. ECF No. 130-4 at 37. When defense counsel brought this to Irwin's attention during voir dire, Irwin responded: "I would vote for the death penalty . . . if the evidence presented itself." *Id.* Defense counsel followed up by asking whether Irwin would still answer that he would always vote for the death penalty regardless of the circumstances. *Id.* at 38. Irwin responded, "[n]ot necessarily," then confirmed that he would consider the possible

---

[7] Two pages of the transcript of Lairson's voir dire examination are irretrievably lost. *See* ECF No. 218 at 67 n. 17. The missing portion includes defense counsel's initial questioning of Lairson. *See* ECF No. 130-3 at 30–32 (omitting the beginning of defense counsel's examination). So, Lairson may have provided additional responses to support her impartiality. In any case, the "critical importance" of demeanor and nonverbal communication "in assessing the attitude and qualifications of potential jurors" further undermines a finding that defense counsel provided ineffective assistance of counsel in relation to Lairson. *See Uttecht v. Brown*, 551 U.S. 1, 9–10 (2007).

punishments equally. *Id*. I do not see this as meritorious grounds for a challenge for cause. Other than what appears to be a mistaken response on his juror questionnaire, Irwin did not indicate that he would automatically vote for the death penalty, as Mulder claims. And, again, Mulder has not overcome the presumption that defense counsel had a reasonable strategic reason for not seeking to remove Irwin. *See Strickland*, 466 U.S. at 689.

Finally, Mulder's *Martinez* claim with respect to counsel's failure to object when the trial court removed a juror because she expressed reservations about the death penalty is also without merit. The potential juror in question, Annaliese Freeman, clearly voiced her reluctance to impose the death penalty and indicated that her feelings about the death penalty would impair her ability to vote for it in Mulder's case. ECF No. 130-2 at 25, 28–30. Despite Mulder's arguments to the contrary, I am not persuaded that Freeman was rehabilitated by defense counsel and demonstrated that her views would not impair her ability to serve as an impartial juror. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (holding that "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'"). In addition, she also struggled with the concept that a defendant is not required to prove his innocence. *Id*. at 27–28. And, when defense counsel asked Freeman if she wanted to serve on the jury, she responded, "Not really." *Id* at 32. So defense counsel had reasonable strategic reasons for not objecting to the trial court's removal of Freeman.

Because Mulder has not demonstrated a reason probability that the IATC claims in Claim Eight would have provided grounds for relief in his state post-conviction proceedings, the default of those claims cannot be excused under *Martinez*.

*Claim Nine* – In Claim Nine, Mulder alleges that his death sentence is invalid under various constitutional provisions "due to the State's presentation of unreliable evidence regarding Mulder's criminal history, its use of his juvenile convictions and other criminal conduct as non-statutory aggravating factors during the penalty phase, trial counsel's failure to object to most of this evidence, and the trial court's failure to prevent its unconstitutional admission." ECF No. 165 at

181. Here again, the claim is procedurally defaulted, but Mulder makes a *Martinez* argument with respect to the portion challenging trial counsel's performance. Mulder contends that his trial counsel should have prevented the admission of testimony from Phoenix police detectives about Mulder's prior convictions, Judy Siebert's testimony about the bank robbery, and evidence regarding Mulder's juvenile convictions.

In the penalty phase of Mulder's trial, the State presented the testimony of a former Phoenix police detective, Joe North. ECF No. 131-19 at 9–23. During his testimony, Detective North read the following excerpt from a probation revocation report prepared by a probation officer:

> Sentences the defendant has received from the juvenile court and from the adult court have not deterred the defendant in engaging in antisocial activity. In fact, the defendant has progressively become involved in more serious and dangerous criminal offenses.

*Id*. at 22. In addition, as discussed above, the State also presented the testimony Detective Shugart regarding the Taco Bell and Church's Chicken robberies. *Id*. at 23–33. Detective Shugart's testimony was based on police reports prepared by someone other than himself. Mulder contends that the foregoing testimony was inadmissible double hearsay that violated his right to due process and to confront witnesses against him.

The problem with this claim is that Nevada law permits the admission of evidence in the penalty phase of a capital trial that may not ordinarily be admissible under the rules of evidence. *See* NRS 175.552 (providing that, during a capital penalty hearing, "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to the sentence, whether or not the evidence is ordinarily admissible"). The trial court has the discretion to admit such evidence "as long as the questioned evidence is not supported solely by impalpable or highly suspect evidence." *Homick v. State*, 825 P.2d 600, 607 (Nev. 1992). In *Homick*, the Supreme Court of Nevada held that the trial court did not error by allowing a police officer to testify about homicides Homick had allegedly committed in California based upon investigations conducted by California and Nevada

law enforcement authorities. *Id.* And, as pointed out in a Ninth Circuit case, the Supreme Court in *Williams v. New York*, 337 U.S. 241 (1949), "held that the Confrontation Clause does not bar courts from considering unconfronted statements during sentencing proceedings." *Sivak v. Hardison*, 658 F.3d 898, 927 (9th Cir. 2011); *see also United States v. Littlesun*, 444 F.3d 1196, 1197 (9th Cir. 2006); *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993), *amended by* 992 F.2d 1015 (9th Cir. 1993).

In his reply to the respondents' answer, Mulder argues for the first time that the evidence was objectionable based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny, which require that any fact (other than a prior conviction) "that increases the penalty for a crime beyond the prescribed statutory maximum [be] submitted to a jury, and proved beyond a reasonable doubt." ECF No. 225 at 115-120 (citing *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (quoting *Apprendi*, 530 U.S. at 490)). However, *Apprendi* was not decided until June 2000, more than two years after Mulder's penalty hearing. While the case was decided prior to the date Mulder's conviction became final, the issue here is not whether the evidence was inadmissible under *Apprendi*, but instead whether trial counsel performed ineffectively under *Strickland* by not objecting to the evidence. As noted above, IAC claims cannot be predicated on counsel's failure to anticipate changes in the law. Without grounds supporting a reasonable probability that objections to the testimony at issue would have been successful if raised at Mulder's penalty hearing, Mulder's state post-conviction counsel did not provide ineffective assistance of counsel by not raising the issue in Mulder's initial post-conviction proceeding. Moreover, I am not convinced that the evidence was necessarily inadmissible under *Apprendi* and its progeny because it did not support the finding of an aggravating circumstance, which is the only fact the jury was required to find beyond a reasonable doubt to establish Mulder's eligibility for the death penalty. *See Nunnery v. State*, 263 P.3d 235, 251 (Nev. 2011).

With respect to Siebert's testimony, which is recounted above, Mulder contends that trial counsel should have objected to it because Siebert could not identify the person who robbed her and because it was irrelevant, more prejudicial than probative, and improper victim impact

evidence. Here again, Mulder cannot meet the *Martinez* standard. Given that the State presented admissible evidence that Mulder turned himself in for the robbery and was subsequently convicted of the crime, the fact the Siebert could not identify him did not make her testimony objectionable. As for its prejudicial impact, Siebert's entire testimony is recorded on less than three pages of transcript and adds very little to the State's case in aggravation beyond the bank robbery conviction itself. ECF No. 131-16 at 14–16. Thus, trial counsel's failure to object to it could not have had an appreciable impact on the outcome of Mulder's penalty hearing.

Mulder's claim with respect to counsel's failure to object to the presentation of evidence of juvenile convictions also fails under *Martinez*. The evidence Mulder cites consists of Detective North reading an excerpt from a probation officer's report that indicated that Mulder's juvenile court and adult court convictions had not deterred him from committing more serious crimes (ECF No. 131-19 at 22) and testimony from another detective, Ron Rose, who read Mulder's juvenile arrest record (*id.* at 39–40). Mulder argues that the use of his prior juvenile convictions as non-statutory aggravating circumstances violated his constitutional rights both because of the lack of due process in a juvenile adjudication and because evidence from juvenile offenses is not reliable due to the unstable nature of a juvenile's development. He does not, however, cite any legal authority to support this claim other than *Roper v. Simmons*, 543 U.S. 551 (2005), a case decided more than 15 years after his trial that did not address the specific issue presented here.

Because Mulder has not demonstrated a reason probability that the IATC claims in Claim Nine would have provided grounds for relief in his state post-conviction proceedings, the default of those claims cannot be excused under *Martinez*.

## III.    Certificate of Appealability

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires the court to issue or deny a certificate of appealability (COA). Accordingly, I have sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).

34

Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The COA standard is not high. Mulder must only "sho[w] that reasonable jurists could debate" the district court's resolution or that the issues are "adequate to deserve encouragement to proceed further." *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations and internal quotation marks omitted). Having reviewed the court's determinations and rulings in adjudicating Mulder' petition, I conclude that the *Slack* standard is met with respect to Claim Six, Mulder's claim that his constitutional rights were violated when the Supreme Court of Nevada concluded that the trial court's use of the *Kazalyn* instruction was harmless error. I therefore grant a certificate of appealability as to that claim. I decline to issue a certificate of appealability for the court's resolution of any procedural issues or any of Mulder's other habeas claims.

## IV.    Conclusion

It is therefore ordered that Mulder's second amended petition for writ of habeas corpus **[ECF No. 165] is conditionally granted in part**. Mulder is granted relief relative to the penalty phase of his trial with respect to Claim One. Mulder is denied relief on all other claims in his second amended habeas petition.

It is further ordered that the respondents must either (1) within 60 days from the date of this order, grant Mulder a new penalty-phase trial, or (2) within 60 days from the date of this order, vacate his death sentence and impose a lesser sentence consistent with the law.[8] In all other respects, Mulder's petition is denied.

---

[8] I will entertain reasonable requests from either party to modify this time period.

It is further ordered that a certificate of appealability is granted as to the following issue: Whether this court erred by concluding that the Nevada trial court's failure to properly instruct Mulder's jury as to the elements of first-degree murder was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). A certificate of appealability is otherwise denied.

It is further ordered that the judgment in this action will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

The Clerk is kindly directed to enter judgment accordingly and to close this case. The Clerk is further directed to provide a copy of this order to the Clerk of the Eighth Judicial District Court referencing that court's case number 96C138790.

Dated: March 10, 2026

_____
Cristina D. Silva
United States District Judge